

# NUMBER 13-07-00735-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**HANNAH RUTH OVERTON,**                                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                  **Appellee.**

## On appeal from the 214th District Court of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Yañez, Garza, and Vela**
**Memorandum Opinion by Justice Yañez**

A jury found appellant, Hannah Ruth Overton, guilty of capital murder, and the trial

court sentenced her to life imprisonment without parole.[1]  By ten issues,[2] Overton

---

[1] *See* TEX. PENAL CODE ANN. § 19.03(a)(8) (Vernon Supp. 2008).

[2] Although Overton presents thirty numbered issues for review, she has grouped several issues together, and we have regrouped and reorganized her briefed issues.

contends: (1) there is error in the indictment; (2) there is jury charge error; (3-4) the evidence is legally and factually insufficient to sustain the conviction; (5) the State withheld material exculpatory information; (6) there is newly discovered evidence; (7) the State presented "extra-record evidence" to the jury; (8-9) there was prosecutorial misconduct; and (10) the trial court abused its discretion by allowing testimony from the State's expert witnesses. We will address Overton's sufficiency issues first and then address her remaining points in numerical order. We affirm.

## I. BACKGROUND

Overton was in the process of adopting a child, A.B., who was placed in Overton's home on June 16, 2006. A.B. became ill on October 2, 2006. Overton and her husband, Larry Overton, took A.B., a four-year-old child, to Urgent Care Center ("UCC").[3] A.B. was then transported to Spohn South Hospital ("Spohn"), and eventually was transferred by ambulance to Driscoll Children's Hospital ("Driscoll"), where he died on October 3, 2006.

The Nueces County medical examiner, Ray Fernandez, M.D., determined that A.B.'s death was a homicide. Overton was arrested and indicted for capital murder. The indictment alleged that:

> Hannah Ruth Overton, defendant[,] on or about October 2, 2006, in Nueces County, Texas, did then and there intentionally or knowingly cause the death of an individual younger than six years of age, namely [A.B.] by causing [A.B.] to ingest a substance or substances containing acute toxic levels of sodium or by injecting [A.B.] with a substance or substances containing acute toxic levels of sodium or by introducing an acute toxic level of sodium into [A.B.'s] body by manner and means unknown to the Grand Jury and/or by causing [A.B.'s] head to strike an object unknown to the Grand Jury or by striking [A.B.'s] head with an unknown object to the Grand Jury and/or intentionally or knowingly, by omission, failing to provide or to

---

[3] Dina Zapata, a licensed vocational nurse ("LVN") at UCC, stated on cross-examination that at the center, they "handle broken bones, asthma, vomiting, diarrhea, fever, rash, cough, [and] cold."

seek adequate and/or timely medical care or treatment to [A.B.] and the defendant had a statutory or legal duty to act or the defendant had assumed care, custody or control of [A.B.]; or by manner and means unknown to the Grand Jury;

And the Grand Jury further presents on the issue of punishment that the defendant used or exhibited a deadly weapon, to wit: sodium; or the defendant's hand or the defendant's hands; or an object unknown to the Grand Jury.

A trial on the merits was conducted. The State presented the testimony of numerous witnesses in its case-in-chief. The State also introduced, among other evidence, State's Exhibit 40, a video recording of Overton's interview with Detective Hess. Overton presented several witnesses and testified on her own behalf. After both sides rested, the trial court read the following charge to the jury:

Now if you find from the evidence beyond a reasonable doubt that HANNAH RUTH OVERTON, defendant, on or about the 2nd day of October, 2006, in Nueces County, Texas, did then and there intentionally or knowingly cause the death of an individual younger than six years of age, namely [A.B.], by causing [A.B.] to ingest a substance or substances containing acute toxic levels of sodium, and/or intentionally or knowingly cause the death of [A.B.] by omission, failing to provide or to seek medical care or treatment for [A.B.] and the defendant had a statutory or legal duty to act or the defendant had assumed care, custody or control of [A.B.]; then you will find the defendant, HANNAH RUTH OVERTON, guilty of Capital Murder as charged in the indictment.

After the jury found her guilty, Overton requested that the venire members specify "which issue the verdict was rendered on, whether it was the first issue of forced ingestion or whether it was the issue of omission." The trial court first asked each member if his or her verdict was "guilty," and each member answered, "Yes." The trial court then asked if the verdict "was on the ingestion or the omission or both." Each juror responded, "Omission."

Overton was sentenced to life imprisonment without possibility of parole. This

3

appeal ensued.

## II. THE EVIDENCE

Sharon Hamil, A.B.'s foster mother, testified that she had been a foster mother for thirty-one years and has fostered approximately three hundred children. After A.B. was removed from his biological mother's home due to neglect and abuse, Hamil fostered him for about eighteen months.

Hamil testified that A.B.'s behavior was normal, and that he was obedient, even when he did not want to do something. According to Hamil, A.B. cried when he was upset; however, if he was not injured, he would only cry "for a few minutes." A.B. did not have long tantrums and did not hurl himself onto the ground, even when playing. Furthermore, A.B. was "potty trained."

A.B. would eat until he was full, and when he did not want more food, he would stop eating, even when Hamil put too much food on his plate. Although A.B. loved to eat, he did not make himself sick by eating too much food, and if Hamil gave A.B. food that he did not like, he would not eat it. A.B.'s favorite foods were pizza and french fries. A.B. did not like spicy foods or onions. When asked by the State whether A.B. preferred a hot dog with or without chili, Hamil responded that he preferred a hot dog without chili.

Hamil stated that she kept salt and pepper on her table, and she never saw A.B. attempt to ingest salt. Hamil sometimes took A.B. to the beach, and A.B. did not drink salt water or put sand or other "weird things" in his mouth. Also, when Hamil took A.B. to the grocery store, he never put "weird things" in his mouth. Hamil had observed some of her foster children hide food in their rooms because they were afraid of going hungry, but A.B. did not do that. Hamil testified that A.B. did not attempt to eat out of the trash.

4

Hamil thought it was a "wonderful idea" for Overton to adopt A.B. because they attended the same church and she "would get to watch [A.B.] grow up." A.B. was very excited that the Overtons wanted to adopt him; according to Hamil, A.B. loved the Overtons, and their children. A.B. was three years and eleven months old when he began the transition to the Overtons' home. After a couple of overnight visits, A.B. moved to the Overtons' home. When A.B. left Hamil's home, she sent him his toys. After the transition, Hamil called Overton to see how A.B. was doing, and according to Hamil, Overton said that everything was going "fairly well," but that A.B. was arguing with her other children. Overton told Hamil that A.B. had broken some of her other children's toys, so as punishment, she broke his Spiderman toy and threw it in the trash. According to Hamil, Spiderman was A.B.'s favorite.

Ana Billeaux testified that Overton and her husband wanted to adopt a child. Billeaux, an adoption supervisor, worked at Spaulding for Children, an agency that facilitates the adoption of children in the foster care system. In accordance with the agency's procedures, the Overtons completed an application for adoption, a home study, and "PRIDE training."[4] Billeaux stated that during the home study, Overton told her that she had a nursing degree and had worked with children with disabilities.[5] At the time Billeaux conducted the home study, A.B. had not "displayed inappropriate behaviors." Nonetheless, Billeaux spoke to Overton about the agency's and the state's discipline

---

[4] The record does not reveal the precise meaning of the acronym "PRIDE"; however, Billeaux described the program as required training for all parents who want to adopt a foster child. At the training, the parents are provided information including, among other things, the agency's discipline policy.

[5] Billeaux stated that according to her notes, Overton claimed to have "LVN" training.

policies, and Overton signed a document indicating that she understood those policies.[6]

Spaulding's policy states:

> The primary purpose of discipline would be to encourage appropriate behavior, not to punish the child. Children must be treated with respect and dignity. Discipline must suit the particular needs and circumstances of each child; and it must take into account the child's age, developmental level, specific behavior, previous reaction to discipline, and history, including any history of physical or emotional abuse. No child may be deprived of basic necessities or subjected to cruel, harsh, unusual, or unnecessary punishment. Only adult caregivers may discipline the child. Children must not be threatened with the loss of placement as a means of controlling behavior. Physical punishment must not be used. Children must not be verbally demeaned or belittled.

According to Billeaux, she informed Overton to follow the discipline outlined in the child service plan that stated:

> [A.B.] has not displayed inappropriate behaviors. He needs reminders and redirection, but no more than any other children in the home. He is friendly, playful, and gets along well with everyone. He has a little more difficulty sharing with his siblings because this is a relatively new concept for him. However, sharing is becoming easier every day. Mr. and Mrs. Overton signed this agency discipline policy and agree that they will not use physical discipline should [A.B.] need behavioral intervention. They will use timeouts, loss of privileges, reminders, redirection, and talking to him.

Overton was also required to follow the State's discipline policy, which does not allow physical discipline or the use of food as discipline. Billeaux testified that under Spaulding's policy, it is inappropriate to withhold food as punishment and that "[f]ood is not used as punishment, period."

Billeaux further testified that Spaulding is required to provide the prospective adoptive parents with all of the records that CPS has concerning the child. Billeaux stated

---

[6] The trial court admitted into evidence State's Exhibit 155, a copy of Spaulding for Children's discipline policy, signed by Overton, and State's Exhibit 156, a copy of the Child Protective Services policy on discipline, also signed by Overton.

that in the documents concerning A.B., there was no indication that he had any illnesses, although the documents indicated that "there was a speech delay." A.B. had a medical exam shortly before placement on May 24, 2006. Billeaux testified that the doctor indicated that everything was "okay."

A.B. lived in Overton's home approximately two weeks before official placement occurred on June 16, 2006. "Official placement" occurs when CPS, the adoption agency, and the family sign "the adoption placement agreement." The placement agreement stated that "they [the Overtons] will be responsible for the child's care and nurturing, including medical care, beginning June 16, 2006." Billeaux testified that Overton planned to enroll A.B. in "Medicaid, just like their other children." During the pre-placement period, Overton "talked to a worker in Human Services [who] told her that she just needed to bring in the paperwork that CPS gave her or the agency gave her, and that's all she needed to do to include [A.B.] in Medicaid just like the other kids were." Therefore, according to Billeaux, Overton could have enrolled A.B. in Medicaid on June 16, 2006. However, Billeaux did not know whether Overton actually enrolled A.B. in Medicaid.

Billeaux was required to visit the family within two weeks of placement and then once a month for the following six months or "until consummation [of the adoptive process] is completed." Billeaux stated that the purpose of a visit is "to see whether there are any problems, anything that we should be doing, if the child is doing well, if the family is adjusting, if the child is adjusting, just to see if there is anything that needs to be addressed or done. . . ." After "official placement" occurred, Billeaux conducted a series of announced home visits on June 28, July 21, August 17, and September 25, each lasting approximately one hour. During the August 17 visit, Overton told Billeaux that A.B. "had

7

been acting up a little bit, but he was settling back." Billeaux was scheduled to make another home visit on September 19; however, Overton and the children had been in a car accident, so the visit was rescheduled for September 25. On that day, Billeaux visited Overton and found her resting and recovering from the injuries she sustained in the car accident. Overton informed Billeaux that A.B.'s "behavior had been more difficult since the accident," and that A.B. "had started picking up things from the floor and the trash and he was trying to eat those [things]." Billeaux informed Overton that there is a condition called "pica" that includes the symptom of eating from the trash, and that A.B. "had to maybe be assessed by a professional if this behavior continued."[7] Billeaux suggested that Overton "seek advice from a pediatrician or other professionals." Overton also told Billeaux that A.B. was "throwing tantrums which var[ied] in intensity and duration, the longest one being 45 minutes." Billeaux stated that Overton told her that because A.B. was not hurting himself or others, they allowed him to cry and "just every once in a while told him you need to calm down if you want to play or if you want to do anything else."

The next contact Billeaux had with Overton was on October 2, 2006 at about 5:15 p.m., when Billeaux received a phone call informing her that A.B. was being taken to UCC and that Overton needed Billeaux to bring the placement agreement because Overton had forgotten it at home. When Billeaux arrived at the clinic, she was informed that A.B. had been transferred to Spohn, so Billeaux went there to find Overton.[8] According to Billeaux, Overton informed her that A.B. had choked on chili, which she interpreted as indicating that

---

[7] Dr. Rotta stated: "Pica is a disorder where human beings, children and adults, eat things that are not nutritious, such as styrofoam cup, dirt, lead, paint chips that might contain lead, things of that nature."

[8] Spohn is across the street from UCC.

8

the child had choked on "a piece of pepper." After A.B. was transferred to Driscoll, Billeaux heard that A.B. was "lethargic" and "not responsive" and that the situation was "very bad."

Jessica Gregory, Larry's sister, testified that she and Overton attended intermediate emergency medical technician (EMT) training at Del Mar College in Corpus Christi, Texas. Anyone who passed the final exam was qualified to take the State certification exam. Although Gregory stated that Overton passed the final exam, she did not know whether Overton took the certification exam. Gregory attended basic EMT training in Corpus Christi, while Overton attended basic training in Tyler, Texas. Gregory stated that the intermediate EMT training at Del Mar was restructured that year as a paramedic class and was considered Paramedic I. According to Gregory, EMT training consisted of assessing a situation and determining whether medical attention is required, and that the job of an EMT is to support and maintain life while getting to an emergency care facility, such as a hospital. Gregory testified that the signs of shock were covered "extensively" because according to Gregory, "[t]hat's one of the number one things that we have to deal with [as an EMT]." Gregory stated, "We learned a lot about fluid balances in the body, electrolytes, salines as well, salt balances."

On October 2, 2006, Gregory was taking care of three of Overton's children. At 11:41 a.m., Gregory received a phone call from Larry indicating that he would pick up one of the children, I.O., from her house because I.O. had an appointment with the chiropractor; approximately an hour later, Larry and Overton picked I.O. up from Gregory's house.[9] Gregory stated that Overton and Larry were at the chiropractor for "[h]alf an hour

---

[9] State's Exhibit 14, Larry's cell phone record for October 2, shows that he called Gregory at precisely 11:41 a.m.

9

at the most." According to Gregory, Overton complained that A.B. had thrown up eight times that day. When Gregory asked Overton if A.B. was sick, Overton responded, "[N]o, he's doing it just to piss me off." On cross-examination, Gregory stated that she believed Overton was exaggerating when she told her that A.B. had vomited eight times that day. On re-direct examination, Gregory testified that Overton "was known" to exaggerate.

Kathryn Haller, Overton's next door neighbor, testified that on October 2, 2006, at 2:52 p.m.,[10] Overton called, asking her to watch Overton's youngest child, S.O.,[11] because A.B. was "making himself puke and pooping and smearing it everywhere." When Haller asked Overton whether A.B. was sick, Overton responded, "He's not sick, he's doing it to try to get to me." According to Haller, Overton described A.B.'s "poop" as "solid" and not diarrhea. Overton told Haller, "So far today [A.B.'s] made himself poop eight times and then smears it." Haller described Overton's demeanor as calm.

At approximately 2:57 p.m., Overton walked next door to Haller's house and left S.O. with Haller. Haller stated that Overton did not have any "poop" or vomit on her clothes and neither did S.O. Overton went back to her house, and at approximately 3:07 p.m., Haller called Overton asking for a diaper for S.O. When Haller arrived at Overton's house to pick up the diaper, she noticed that Overton had changed her clothes; Overton explained that A.B. had thrown "poop" at her. Haller then returned to her home with the diaper. At approximately 3:45 or 3:50, Haller saw Larry arrive at the home. Haller immediately returned S.O. back to Overton's home. When Haller left S.O. with Larry, she did not see or speak to Overton.

---

[10] Haller testified that her caller ID showed that Overton called her at precisely 2:52 p.m.

[11] S.O. was two years old.

10

Dina Zapata, a licensed vocational nurse at UCC, testified that on October 2, 2006, A.B. arrived at 5:17 p.m. and was not breathing.[12] A.B. was cool to the touch, did not have a pulse, his eyes were open, and his pupils were dilated. According to Zapata, dilated pupils usually indicate that a person is "brain dead." A.B. did not have a pulse while at UCC. Zapata called 911, and Dr. Wesley Jakubowski, the pediatrician working at UCC on October 2, 2006, started giving A.B. "breaths." Dr. Jakubowski immediately placed a "bag mask" that covers the mouth and nose on A.B.'s face. Overton performed compressions to A.B.'s chest. According to Zapata, due to the compressions, A.B. vomited[13]; there was a large amount of vomit that had a strong odor and color of "chili."[14] Zapata stated, "[H]e was a little guy vomiting excessively, more than his stomach could handle." Zapata questioned Overton about A.B.'s past medical history in order to determine why A.B. was not breathing.[15] Overton told Zapata that A.B. vomited one time,[16] passed out, and quit breathing; she then performed CPR on him in the car on the way to UCC. According to Zapata, Overton indicated that A.B. had also passed out on October 1, but that she did not take A.B. to the doctor. Zapata stated that Overton was calm, had "a smirk on her face," and did not appear to be upset. On cross-examination, defense counsel asked, "You don't

[12] On cross-examination, Zapata stated that she was usually the only nurse on duty Monday through Friday at the center. The center also had a medical assistant, phlebotomist, and one or two doctors depending on the time.

[13] Zapata stated that A.B. was not consciously vomiting.

[14] On re-direct examination, Zapata clarified that the vomit was "[r]eddish brown, chili color. . . . A strong chili smell. If you go to Wendy's and get a cup of chili and open it up, that smell, but stronger."

[15] Overton informed Zapata that A.B. did not have a seizure, did not have a history of seizures, did not have asthma, and did not have a heart condition.

[16] It is not apparent from the record whether Overton meant that A.B. vomited at her home or in the car. However, there is evidence that A.B. vomited at Overton's home.

11

know that that look wasn't just [Overton's] best face as she was trying to perform CPR on this child?" and Zapata replied, "No."

Zapata observed bruising on the left side of A.B.'s lower rib cage that appeared to be fading. It appeared to Zapata that A.B. had suffered a cardiac arrest. Zapata stated that the only medication given to A.B. at UCC was epinephrine.[17] On re-direct examination, Zapata clarified that paramedics arrived at 5:20 or 5:22 p.m., and Teresa Ercan, an emergency room nurse supervisor at Driscoll Children's Hospital, arrived at approximately 5:27 p.m.

Ercan testified that on October 2, 2006, she received a call from UCC at 5:23 p.m. and arrived at the center five minutes later at 5:28 p.m. When Ercan arrived, paramedics, responding to Zapata's 911 call, had already arrived and had established an airway into A.B. through "intubation, where they [were] taking care of his breathing for him."[18] Ercan described A.B. as "very pale in color" with a distended stomach. A.B. did not make any "spontaneous movements." Ercan read her statement into the record:

> I asked the woman when the child had his last meal, and she said right before coming to the clinic he ate some chili. I asked if he had any allergies to the ingredient of chili, and she did not think so. There was some confusion as to the sequence that led up to the full arrest of this child.[19]
>
> . . . .
>
> And so I had asked for some clarification. She said he ate the chili and he

[17] Dr. Rotta, the State's expert witness, explained that epinephrine is "a hormone that is present in the body. It's also known as adrenalin." Adrenalin accelerates the heart rate and it is the "main drug used to resuscitate someone in cardiorespiratory arrest." Dr. Rotta opined that epinephrine "would not cause sodium levels to skyrocket," even if multiple doses were administered.

[18] On cross-examination, Zapata explained that intubation occurs when a tube is placed in the airway.

[19] Ercan stated that a full arrest occurs when the heart stops and the person stops breathing on his own.

was cold and I gave him a blanket and he vomited at home. . . .

Ercan stated that Overton's statement did not clarify the sequence for her. Ercan gave A.B. his first dose of epinephrine. The paramedics started an intraosseous[20] needle into A.B.'s bone in order to "rapidly give fluids or medication" to him. The paramedics placed a bag of saline solution with an 0.9 percent concentration level hanging with the fluid being forced into A.B.'s body through gravity. Ercan did not accompany A.B. to Spohn. On cross-examination, Ercan stated that Overton assisted in the resuscitation efforts by giving A.B. chest compressions. According to Ercan, Overton did not appear to be behaving unusually in the situation.

Dr. Jakubowski testified that on October 2, 2006, he was working at UCC, and was called to examine A.B., who was not responding to stimuli. According to Dr. Jakubowski A.B. did not have a pulse, A.B.'s extremities were cold to the touch, and A.B.'s pupils were dilated; Dr. Jakubowski explained that these symptoms signified that the child was already dying. Dr. Jakubowski stated that because a lot of chili was coming from A.B.'s mouth, they had to suction those contents from his mouth. According to Dr. Jakubowski, it was a huge amount of chili and more than he would have expected to come out of a four-year-old child. Dr. Jakubowski stated that he knew that it was chili because it had an odor of chili and was a dark brownish color. After an airway was established by intubation, Dr. Jakubowski administered four milliliters of epinephrine through the intubation tube because no IV had been established.[21] A.B. did not have a pulse when he left with the paramedics, and he was not breathing. Dr. Jakubowski noticed a bruise on the right side of A.B.'s

---

[20] Ercan explained, "Intraosseous is when you establish vascular access by accessing the bone."

[21] Dr. Jakubowski explained that epinephrine is the first drug administered when a child is dying.

13

upper abdomen. According to Dr. Jakubowski, it usually takes time for a bruise to appear; therefore, he opined that it was very unlikely that the bruise was caused by CPR. Dr. Jakubowski stated that Overton did not indicate that A.B. had any recent medical problems, but she stated that A.B. was not sick "too much." She told him that A.B.'s vomiting had started that day. When the State asked Dr. Jakubowski, on re-direct examination, if he noticed anything unusual or if Overton was smiling, he stated, "I think it was nervous laughter sometimes. . . . Just nervous laughter, I would say because the situation was tragic, you know."

Gemma Mitchell, a phlebotomist at UCC, testified that she observed that A.B. vomited a reddish substance that had a strong odor of chili, what she described as a "comino" or spice smell. Mitchell saw a lot of liquid and did not see any beans and only a little meat. Mitchell testified that she heard Overton state that A.B. "ate chili and he was punished; so she put him aside. And by the time she looked at him, he wasn't breathing at all."

John Dodge, a paramedic with the City of Corpus Christi Fire Department, testified that when he arrived at UCC, Overton was performing CPR on A.B. and A.B. did not have a pulse and was not breathing. When he asked what had happened to A.B., Overton told him that A.B. had choked on chili. While cutting A.B.'s pants, Dodge noticed what appeared to be burns on A.B.'s leg. Dodge also saw some bruising or sores on A.B.'s right elbow. On cross-examination, Dodge stated that in his report, he documented that there was a bruise on A.B.'s leg and some sores on his elbow. However, Dodge admitted he did not report that there were burn marks. On re-direct examination, Dodge stated that he believed the sores on A.B.'s arms were burn marks. According to Dodge, if there is "any

14

kind of inkling of child abuse," he is required to call police; therefore, he called the police. Dodge stated that A.B.'s pupils were dilated by five millimeters, consistent with someone who is dead on arrival. Dodge explained that although A.B.'s pupils were dilated to that point, "with a child you still try to work them. With an older person you would call the hospital and tell them what you've got." Paramedics took A.B. to Spohn, which is across the street from UCC. Dodge did not observe any bruise on A.B.'s nose or any head trauma.

Elliot McAllister, a paramedic, testified that he assisted Dodge in caring for A.B. at UCC. According to McAllister, he heard Overton state that A.B. might have choked when he ate some chili, and that because A.B. usually became sleepy after eating, she thought that "he was getting sleepy again because he ate a lot of chili and he was just laying down with a full stomach." McAllister saw two marks on A.B.'s arm, which he believed looked like cigarette burns.

Raul Gamez, a Corpus Christi police officer, testified that he was dispatched to Spohn to "back up the fire department on an unresponsive four-year-old child." Officer Gamez observed some sores on A.B.'s arms, and some scratches on his stomach and his "butt area." When the State asked him if Overton appeared upset, Gamez responded that Overton did not display any emotion and had a blank stare. Jesse Hernandez, a police officer, stated that he observed several injuries to A.B., including the following: (1) bruising across the tip of his nose and down his nose; (2) redness and scratches along his neck, chin area, and torso; (3) boils or possible burns to his arm; and (4) bruising on his "buttocks" and on his right knee. After observing the injuries, Officer Hernandez contacted Child Protective Services ("CPS").

15

Jodi Mendoza, a social worker at Driscoll, testified that Overton told her that after A.B. ate the chili, he wanted more, but she did not want to give him any more. Rather than give A.B. more chili, Overton gave him a glass of water mixed with an unknown amount of chili powder.[22] Overton told Mendoza that when A.B. started drinking the mixture, he was kicking and screaming. After A.B. finished drinking, he stumbled to the floor and threw up. A.B. told Overton that he was cold; he then stopped talking and became "lethargic." A.B. would not respond to Overton's questions, so she called Larry to come home. Overton said that A.B. was in shock but was breathing and moaning. Overton wrapped a blanket around A.B., and when Larry arrived, they put him in the car and drove to UCC. En route to the center, A.B. stopped breathing and Overton performed CPR. Overton told Mendoza that A.B. was "fine" earlier and did not "have any signs of being sick." Overton informed Mendoza that A.B. had been hurting himself during the last few weeks and had "pooped" in his bed the previous night. Overton told Mendoza that A.B. had mosquito bites on his arm that he scratched a lot. Overton stated that when one of her other children had an appointment at UCC, a doctor told her to put Clorox on A.B.'s mosquito bites. According to Overton, A.B. had a "staph abscess, [sic] a staph infection" on his arm. Mendoza

---

[22] During a video recorded interview with Detective Hess, Overton stated that she put some "chili powder" in some water and asked A.B. if he wanted to drink it. Detective Hess asked, "What was that?" and Overton responded, "Zatarain's, the seasoning. . . ." According to Overton, she refers to Zatarain's as chili powder. Dr. Rotta testified that there is a significant amount of salt in Zatarain's seasoning, and once he learned that Overton gave A.B. Zatarain's he performed several calculations to determine whether the Zatarain's could have caused the level of sodium in A.B.'s system. Dr. Rotta stated, "Because [knowing the amount of Zatarain's necessary to cause a sodium level of over 250] was very important to [him]" once he discovered how much sodium chloride was in the product, he performed calculations to determine the amount needed to cause the level of sodium in a child A.B.'s size. According to Dr. Rotta, one quarter of a teaspoon of Zatarain's has 0.9 grams of salt. Therefore, based on Dr. Rotta's calculations, it would take twenty-three teaspoons of Zatarain's to cause the level of sodium in a child A.B.'s size. Dr. Rotta opined that "it was very possible from a logistics standpoint that someone could have been made to ingest that quantity of salt" from either a small or large container of Zatarain's. Dr. Rotta testified that he discovered that a seventeen-ounce container of Zatarain's was found at Overton's home. According to Dr. Rotta, there are 134 teaspoons in an seventeen-ounce container of Zatarain's.

16

testified that Overton did not show any emotion. On cross-examination, Mendoza stated that she documented that Overton's mood was "unremarkable" from a list describing various moods including "hostile," "sad," "anxious," "withdrawn," or "labile."[23]

Dr. Daniel Wagner, an emergency medicine physician at Spohn, testified that A.B. was dead when he arrived at Spohn. According to Dr. Wagner, it took twenty minutes to "get [A.B.] back." Dr. Wagner stated that when he assessed A.B.'s breathing, he did not "get very good breath sounds" from the intubation tube administered by EMS; therefore, he removed the tube, placed a breathing mask on A.B., and reintubated A.B. with another tube. The intraosseous line ("IO cath") into the left leg was not flowing properly, so Dr. Wagner put an IO cath in A.B.'s right leg. Dr. Wagner administered epinephrine through the intubation tube. Dr. Wagner opined that A.B. was not dehydrated based on lab results. When the State asked him to describe Overton's demeanor, Dr. Wagner stated, "Silence. She was kind of shocked. She didn't say much at all. In fact, I don't remember any responses."

Dr. Alexandre Rotta, a pediatric critical care specialist at Driscoll and the State's expert witness, testified that he treated A.B. on October 2, 2006. Dr. Rotta received a call that A.B. "presented in full cardiorespiratory arrest" to UCC, that Edgar Cortes, M.D., had stabilized[24] A.B., and A.B. was being transported from Spohn to Driscoll.[25] When A.B.

---

[23] Mendoza explained, "Labile is when you're up and then you're down; your mood changes."

[24] Dr. Rotta stated, "Stabilizing is making sure that [the patient] has an airway that you can ventilate him through, that he has a pulse, that he has a blood pressure that's measurable, and preferably that there is no ongoing CPR."

[25] Dr. Rotta explained that respiratory arrest means that a person stops breathing and cardiac arrest occurs when the heart stops beating. Dr. Rotta further explained: "Cardiac arrest means usually that a respiratory arrest has already happened, some time goes by, and then your heart stops."

arrived at Driscoll, he was connected to a ventilator and was "resuming spontaneous circulation . . . a pulse after minutes of CPR." However, he was "very unstable with low blood pressure, in shock."

Dr. Rotta examined A.B. from head to toe and noticed numerous injuries to A.B. Because the injuries on A.B.'s body were too numerous to count and address in a particular note in his report, Dr. Rotta asked a forensic nurse to take pictures of the injuries. Dr. Rotta noted, among other injuries, the following: (1) an ulcerated lesion on A.B.'s arm; (2) bruises to the nose, mouth, torso, knee, shin, and buttocks; and (3) numerous scratches, to the face, neck, arm, chest, and back, among other places. According to Dr. Rotta, some of the scratches were on areas of the body that A.B. could not have reached. Dr. Rotta stated that A.B.'s nails were not long and that it would be "very, very hard" for A.B. to have caused the scratches that were on his body. Furthermore, there was no evidence of blood, skin, or scabs underneath A.B.'s fingernails. When the State asked Dr. Rotta to describe State's Exhibit 28, a picture of the bruise on A.B.'s buttocks, he stated, "So what you see here are injuries that are on areas that are totally exposed and would actually be the areas of contact if this child were to have spent a significant amount of time flat on a hard surface. One could also postulate that this is an area of impact if the child were to be hit on this area." According to Dr. Rotta, the bruise on A.B.'s arm was about the size of an adult thumb and could have been caused by someone forcefully squeezing the arm; and the bruise on A.B.'s nose was not likely caused by medical treatment. Dr. Rotta testified that A.B. had some older skin lesions to his foot that he believed were insect bites. Dr. Rotta did not see any scarring or evidence that the lesions were "scratched hard enough to break the skin." According to Dr. Rotta, this was the one part of A.B.'s body that

18

did not have scratches.

A computer axial tomogram ("CAT") scan of A.B.'s head revealed that A.B. had swelling of the brain, bleeding inside the brain, and bleeding around the brain. According to Dr. Rotta, the bleeding in the brain could have been caused by the high levels of sodium or by trauma. Dr. Rotta opined that the CAT scan is better for observing bleeding in the brain and is not sufficient to observe small injuries to the scalp or the skull. Dr. Rotta testified that it was not one isolated injury that concerned him, but the "totality of the injuries" on a child that was presented with cardiorespiratroy arrest and was dying. Dr. Rotta stated, "It is not one isolated skin injury that we've seen that would make me concerned. It's the totality of it, the bruises, the bruises of different ages, the scratches, the scratches in places where a child wouldn't normally be able to reach." Dr. Rotta was convinced that a crime had occurred and suggested that the police become involved.

After learning that a blood test at Spohn revealed that A.B. had "incredibly high" sodium and chloride levels in his blood, Dr. Rotta drew more blood to be sent to Driscoll's lab for testing. Dr. Rotta stated, "And your first reaction as you encounter the highest sodium reported in men is maybe this is not right. I need to absolutely confirm that." A.B.'s sodium level at Spohn was 242 and his chloride level was 222.[26] To reach this level of sodium, according to Dr. Rotta, A.B. would have had to ingest twenty-three teaspoons of Zatarain's or six teaspoons of salt. Dr. Rotta stated those levels were the highest he had ever seen in a patient and "arguably [the sodium level was] one of the highest ever reported." The tests of A.B.'s blood at Driscoll put his sodium level at greater than 250 and his chloride level above 200. Dr. Rotta testified that in addition to the blood chemistry test,

---

[26] Dr. Rotta stated that normal chloride levels are between 98 and 108.

19

a separate lab conducted a test on the arterial blood gases, "a second way of looking at sodium" levels. "The arterial gas also confirmed a sodium [level] that was greater than 250."

Dr. Rotta testified that sodium levels should be between 135 and 145, and that "the immediate expected reactions [of sodium intoxication] would be that of discomfort," with the possibility of nausea and vomiting. Within half an hour, a patient would have a "pronounced thirst" and "try to seek water at any cost."[27] According to Dr. Rotta, a person does not "tolerate having a high sodium without wanting to fix it." This pronounced thirst would be followed by more discomfort, changes in consciousness, changes in behavior, trouble breathing, loss of consciousness, seizures, and finally, cardiorespiratory arrest.

Dr. Rotta testified that he knew A.B. had a "much greater chance of not surviving than surviving," but that since there is an "outside chance of survival," they continued to try to resuscitate him as they would with any child.[28] According to Dr. Rotta, if a healthy child stops breathing and his heart stops beating, it is possible for doctors to resuscitate that child. However, if the patient goes into shock or a more severe situation, then it is much harder to resuscitate. Dr. Rotta stated that after six to ten minutes of arrest, "almost universally, unless in very specific circumstances, if a person survives[,] they will have massive residual injuries, such as injuries to the brain from lack of oxygen. They will

---

[27] According to Dr. Rotta, sodium is very tightly controlled by the body and is kept within a narrow range of 135 to 145. A person with a sodium level of 160 or 165 usually does not occur in people who can stand up and get water. Someone who was walking around with a sodium level 165 would exhibit abnormal behavior. Dr. Rotta has seen children with various illnesses that have elevated sodium levels who drink water out of the toilet or an aquarium. Dr. Rotta did not believe this was a case of a mild elevation of sodium because A.B. had "free access to water and just chose not to drink it" and mild salt intoxication "usually happens in people that don't have access to water, such as infants who can't get water by themselves."

[28] Dr. Rotta stated that resuscitation occurs in a patient that "has lost complete vital signs and if left alone will die."

20

have—if they manage to survive, they are likely not to be able to interact with the outside world." If a child goes into cardiac arrest outside the hospital, "there is less than a one in ten chance of survival; and almost all those patients that survive have significant neurological devastation." Dr. Rotta opined that A.B. could have survived if he had been taken to the hospital "more quickly."

Dr. Rotta created a report documenting A.B.'s medical history that he acquired from Overton, including, among other things, what lead to the catastrophic event. Dr. Rotta testified that he was not informed that A.B. had been vomiting previously, or that A.B. had passed out on the previous day. Furthermore, Overton did not indicate that A.B. had suffered a seizure. Overton told Dr. Rotta that on October 2, 2006, she had an appointment with the chiropractor and that A.B. was well until after they returned home. Overton told Dr. Rotta that on the way to the chiropractor, A.B. was upset because he wanted to eat at McDonald's; but because he was misbehaving, Overton told him he could eat when they got home. Overton told Dr. Rotta that she gave A.B. some "chili" when they arrived home, and he ate a "significant amount." When Overton told A.B. to stop eating, he allegedly had a temper tantrum, so she mixed some "chili powder" with water and told A.B. that if he wanted to eat, he should drink the mixture. Overton told Dr. Rotta that A.B. drank the water with chili powder "to her surprise" and "sometime later he stumbled to the ground and started having difficulty breathing, had a change in his level of consciousness . . . [and] felt cold . . . ." According to Dr. Rotta, Overton stated that after A.B. stumbled, he was "drifting in and out of consciousness." After Overton called him, Larry arrived within ten or fifteen minutes. Overton and Larry attempted to warm A.B. in a warm bath. Dr. Rotta stated that this action was counterintuitive because a bath cools a person down, "no

21

matter what." Overton and Larry decided to take A.B. to UCC; according to Overton, A.B. stopped breathing en route.

Dr. Rotta noted that he found Overton's description of the time line unusual. Dr. Rotta testified that there were several things about Overton's description that did not make sense. Dr. Rotta stated:

> One is why someone would give powder and water to a child. Second is the fact that the report was that the difficulty started immediately after . . . he drank the powder and water, and then the 'I am cold,' . . . statement that the child supposedly made, and then trying to warm up the child by giving a bath, then taking the child to a clinic as opposed to an emergency department in full arrest.
>
> . . . .
>
> I am not convinced that the history I obtained represented the facts that occurred that night in their entirety. So for whatever reason, some of the information, you know, wasn't very forthcoming. There was something about the interview [with the Overtons] that made me think, you know what, maybe this is really just not everything that happened.

According to Dr. Rotta, A.B. exhibited symptoms of sodium poisoning. He stated:

> We have a child that was well until that afternoon, that had behavioral issues, that was having temper tantrums, that was then given something that is not to reward his behavior, probably to punish his behavior, that then goes into cardiorespiratory arrest and before doing so has symptoms of drifting in and out of consciousness, difficulty breathing, which is probably an issue with the acid build-up in the body, and then arrests.
>
> By then I have a very clear cause relationship effect, as in things that happened prior to him arresting were directly responsible for him arresting. And the one thing that stands out is the fact that I have someone that told me that he was given something that he shouldn't have been given, water with chili powder, knowing that it is very likely at the time, and now I know for sure, that the powder that was given could contain very high levels of salt.

Detective F. Michael Hess, a detective with the Corpus Christi Police Department, testified that he received "a page" that a child, A.B., had stopped breathing. Detective

22

Hess was instructed to go to Spohn, but he received a second page directing him to Driscoll. When Detective Hess arrived, he asked Overton to go to the police station to answer some questions. During the interview with Overton, he took breaks to call Dr. Rotta and another officer, Detective Hugo Stimmler, who was taking pictures of Overton's house. During Detective Hess's testimony, the jury saw a video recording of his interview with Overton.

On October 5, 2006, Detective Hess went with a photographer to Overton's house. Detective Hess testified that there was a "pill box" or "pill bottle" on a shelf that contained a brown powder that appeared to be a spice.

Dr. Fernandez, the medical examiner for Nueces County who performed the autopsy, testified that he observed three small round areas at the back of A.B.'s forearm that were burn-like scarring. After taking a biopsy of the injuries, Dr. Fernandez determined that the wounds did not have staph infection. "[The wound] had a small amount of inflammation and there was loss of the skin surface and some of the appendages that are on the skin surface." The wounds were caused, in Dr. Fernandez's opinion, by contact with a hot surface or flame.

In examining A.B.'s tongue, Dr. Fernandez observed a fresh impression of teeth and bleeding inside the tongue muscle, which Dr. Fernandez opined was a bite mark, which commonly occurs during "seizure type convulsions." When Dr. Fernandez examined the stomach, he noted that the stomach lining had inflammation and discoloration, which was consistent with irritation from salt or spices. After removing the skull, Dr. Fernandez noted that there was a sub-scalp hemorrhage—that is bleeding underneath the scalp in the soft tissue between the scalp and the surface of the skull. This type of hemorrhage would not

23

have been seen by doctors in the emergency room. The hemorrhage would not have been caused by a "simple, regular fall." According to Dr. Fernandez, the sub-scalp hemorrhage was an impact or trauma-type injury and would not have been caused by the high sodium level. A child with an impact injury to the head would be "dazed, maybe becoming unconscious or becoming—going into a coma. . . . He may have some vomiting also with it, seizure type activity. . . ."

Dr. Fernandez testified that A.B.'s death was non-accidental, and he classified the manner of death as a homicide—a death at the hands of another.

Overton testified that A.B. was "obsessed with eating" and that at every meal, he ate more than her other children.[29] Overton was concerned because A.B. ate as much food as she and Larry ate. According to Overton, A.B. "was always looking for crumbs on the floor" and if she took him to the store, she had to put him in the shopping cart so that he would not eat off the floor. Overton stated that she fed A.B. three meals a day and snacks. Overton explained that when A.B. had been in her home "longer," A.B. "was having more and more issues with eating off the floor and getting into the trash and eating the cat food." When Overton "caught" A.B. eating something inappropriate, she took away one of A.B.'s privileges, such as giving him a "timeout," sending him to his bed until "he could calm down," or not allowing him to have a snack or dessert. A.B. would become extremely upset when he was not allowed to eat the food that he wanted to eat. Overton claimed that she informed Billeaux that A.B. was eating inappropriately and excessively and that Billeaux told Overton that she would "look into" finding a doctor to examine A.B.

On September 12, 2006, the Overtons, and the children were in a car accident.

---

[29] Overton had five children, including A.B., and was pregnant with her sixth child when A.B. died.

Overton explained that she was bloody, which scared her children, who were screaming. According to Overton, the paramedics asked if anyone was injured and she and her daughters indicated that they were injured and went to the hospital. Overton suffered whiplash, her face was bruised, her front four teeth were loose, and her lip was "busted." According to Overton, from that point forward she was "really not out of bed."

Overton recalled that A.B. was very destructive and thought it was "funny" when he broke her other children's toys. Overton alleged that the majority of the toys that Hamil sent for A.B. were broken. When A.B. broke a sibling's toy, Overton would take one of A.B.'s toys away for the day. Overton stated that she told Hamil that she took away A.B.'s Spiderman toy for a day, but that she gave it back to A.B. On cross-examination, Overton denied telling Hamil that she had broken A.B.'s toy.

Overton testified that A.B. had mosquito bites on his arm that he had "picked" until they became infected. However, according to Overton, she could not take A.B. to the doctor because he did not have insurance. Overton claimed that she attempted to get Medicaid for A.B. before the car accident, but could not because she did not have A.B.'s social security card. Overton's other child, S.O., apparently also had a mosquito bite that was infected, so Overton took S.O. to the doctor so that they could get medicine for the infection. The doctor gave Overton an antibiotic to treat the infection, and according to Overton, told her to put Clorox mixed with water on A.B.'s wounds, which she did. Overton stated that although she had enough antibiotic for both A.B. and S.O., when she attempted to give A.B. the medicine, he "spit it back" at her. Overton claimed that she did not make any more attempts to give A.B. the medicine because she was "not in any shape to try and force him to take it." However, according to Overton, A.B. accepted the Clorox "treatment."

25

Overton testified that A.B. "threw fits" and that Hamil had inquired if Overton was prepared to care for a child who "may throw excessive fits." According to Overton, during his "fits," A.B. would "throw himself to the floor or bang his head on the wall." Overton stated, "It was more like destructive in himself, like he was trying to hurt himself in his fits." To address the "fits," Overton sent A.B. to his bed and told him to stay there until he was calm, and once A.B. calmed down, he was allowed to get out of bed. Overton claimed that under CPS rules, she was not allowed to restrain A.B. According to Overton, after the car accident, A.B.'s temper tantrums increased from one every two or three days to one every few hours. A "couple of people" advised Overton to send A.B. back to Hamil, but Overton did not want to send him back.

Overton testified that on October 1, 2006, Larry took the children, except for A.B., to church. Overton stayed home with A.B., and they watched cartoons together. Overton stated that she fell asleep, and when she woke up, she found A.B. in the kitchen. Overton alleged that A.B. "had gotten into the refrigerator" and had eaten an unknown amount of food. A.B. became upset because he wanted to continue eating, so Overton told him to stay in his room until Larry came home to talk to him. According to Overton, while he was in his room, "A.B. got really upset and he pooped himself" and then "smeared it all over the wall and all over the sheets, and it got all over the mattress." Overton stated that A.B. told her he had defecated because he was mad at her. On cross-examination, Overton stated that A.B. "pooped at will. . . . [H]e would squat down and he would push until he pooped and then he would throw it and smear it."

When Larry arrived home, he went to A.B.'s room and cleaned up the mess. Larry removed the mattress and took it outside and washed it. A.B. asked if he could have a

"warm bath," and according to Overton, Larry responded, "No, you are not going to take a warm bath. You just got poop all over the place and smeared it all over the place." On cross-examination, Overton stated that as punishment, Larry took A.B. outside and washed him with the water hose. In her statement to Detective Hess, Overton explained that A.B. was naked when Larry washed him with the water hose. After Larry washed A.B.'s mattress with the hose, he left it outside to dry. A.B.'s sheets were placed in the trash can, but according to Overton, because A.B. attempted to take the sheets out of the trash, Larry took the sheets outside and eventually burned them.

Later that day, Gregory called and asked if Overton's children could go to her house to play with Gregory's children. Overton allowed her children, except for A.B. and S.O., to go to Gregory's house. Overton eventually allowed the children to spend the night at Gregory's house. Overton, Larry, A.B., and S.O. ate at a Mexican restaurant. According to Overton, A.B. did not like Popeye's chicken; however, he liked spicy foods, such as jalapenos and salsa. When they returned home from the restaurant, A.B. was hungry again, so Overton prepared "chili." Overton described the "chili" as "a beef stew with some stuff added to it." Overton asserted that she refers to any mixture as "chili," and that the ingredients she used to make the "chili" were a condensed soup and "some Zatarain's seasoned salt."[30]

At this point, there was no mattress on A.B.'s bed; Overton explained that underneath the mattress was a piece of "bare plywood." Overton stated that A.B. put his sleeping bag on the plywood and then lay down to go to sleep. According to Overton, A.B.

---

[30] The trial court admitted Defense Exhibit 9, a can of vegetable beef soup that Overton testified was similar to the type of soup she used to make "chili."

had a temper tantrum about fifteen minutes after he went to bed and told her that he was not going to sleep on the plywood. A.B. eventually slept on the floor in Overton's bedroom. In her statement to Detective Hess, Overton said that she and Larry put A.B. on his bed without a mattress; she told A.B. that he could sleep on the plywood because "he messed up."

On October 2, 2006, Overton, A.B., and S.O. woke up at approximately 7:00 a.m. Overton fed the children breakfast, and then they went to bed to watch cartoons for two hours. Larry went to work. Overton fell asleep, and when she awoke, A.B. was in the pantry and was on a stool by "where all the sugar and the—on the shelf that had unsweetened chocolate, sugar, [and] a spice rack." Overton claimed that A.B. had been eating something from the pantry, but she did not know what it was. Overton put A.B. in "timeout" for three minutes.

A.B. then told Overton that he wanted to eat; however, Overton wanted A.B. to wait until Larry came home because they planned on taking the children to McDonald's for lunch. A.B. became upset, and according to Overton, "started throwing another fit and he pooped again in his pants. And stuck his hand down his pants and grabbed it and threw it at [Overton]." Overton gave A.B. a "wipey" so that he could wipe himself off and attempted to help him change his clothes. Overton testified that "as soon as we got him in new clothes and I went and put his clothes into the washer and got everything cleaned up, [A.B.] pooped on himself again." According to Overton, A.B. stated, "I'm going to poop on you, I'm going to poop on you because you won't feed me." Overton attempted to calm A.B. down, but he began smearing the "poop" on the floor. Overton then told A.B. she would give him something to eat; she fed him left-over "chili" from the previous night.

28

Overton testified that S.O. "used the opportunity to go and get a hot dog out of the refrigerator. And he [S.O.] was eating a hot dog." Overton explained that because she was describing events that occurred eleven months in the past, her account of the events were "probably not" in the exact order that they occurred.

When Larry arrived at the house A.B. was eating. Larry cleaned up the mess that A.B. allegedly made and Overton lay down to rest. Overton and her son, I.O., had an appointment with the chiropractor at 2:00 p.m.; Larry and A.B. accompanied them. They stopped at the drive-thru at McDonald's before going to the chiropractor's office; Larry bought "some food" and Overton bought an ice cream cone. According to Overton, S.O. did not want anything from McDonald's; however, A.B. started crying because he wanted some food. Overton stated that A.B. was not allowed to have any food because he had already eaten at home. They then went to Gregory's house to pick up I.O., went to the chiropractor, and then returned I.O. to Gregory's house. According to Overton, when they picked up I.O. from Gregory's house, she felt like she wanted to vomit, so she got out of the car and informed Gregory that A.B. had "been pooping all over himself." Overton stated, "[Gregory] asked me if [A.B.] was sick and I told her no, I didn't think he was sick, that he was saying he was doing it to make me mad." On cross-examination, Overton denied telling Gregory that A.B. was "trying to piss her off."

Overton testified that Larry dropped A.B., S.O., and her off at the house at approximately 2:30. Overton stated that when they arrived, A.B. went to the kitchen and said that he was hungry. Overton told him that he had already eaten and he started crying. Overton decided to allow A.B. to eat some more "chili." Before serving the chili to A.B., she put some Zatarain's into it. According to Overton, it took A.B. about twenty minutes to eat,

29

which she found unusual because "it was very rare that it took [A.B.] more than five or ten minutes to eat." When A.B. finished eating, he asked for more chili, but, Overton told him "no." Overton testified that A.B. started kicking, screaming, throwing himself to the ground, and stating that he was "going to poop" on Overton.

Overton called Larry to come home, but he told her that he was not able to leave work at that moment. Overton then called Haller and informed her that A.B. "had been pooping himself multiple times that day and that he was telling [her] he was going to do it again and that the last time he did it [S.O.] was getting into the poop and that [Overton] didn't feel like [she] was up to cleaning it and keeping [S.O.] out of it and taking care of [A.B.] and everything all at once." Overton then took S.O. to Haller's house. Overton testified that she did not go into Haller's house, but that Haller met her in the front yard.[31] A few minutes later, Overton walked back to her house, and when she entered her home, she found A.B. in the kitchen calmly sitting down; he asked for a drink of water. Larry called, and Overton told him that A.B. was calming down and they were going to take a nap. Overton testified that as she hung up the phone, A.B. started crying and said that he wanted the Zatarain's. Overton told A.B. that he had already eaten and that he had to wait for his next meal; however, A.B. "was just screaming and screaming and started to throw himself on the floor again." Haller then called Overton and asked for a diaper for S.O.; Haller came to Overton's front door, and Overton gave her the diaper. According to Overton, A.B. was "throwing a fit in the kitchen dining room area" when she answered the door. Overton testified that A.B. continued to threaten to "poop" and ask for food, so she decided that if she gave him "a little bit of the flavor of what was in the chili that it would get

---

[31] Overton stated that she left her front door open when she met Haller outside.

30

him to calm down." Overton stated, "I put—I had his cup of water and I put a couple of sprinkles of the Zatarain's in the water. And I filled the water up the rest of the way. And then I thought you know what? That's a little too much. So I took some of what was in the cup and put it in a sippy cup. . . . And I handed it to [A.B.] and said, you can have—you know, you can have this if you want this, to try and calm him down." According to Overton, A.B. "took a couple sips" and then asked her to put more "seasoning" into his cup. Overton stated that when she was attempting to pour some more seasoning into the cup, A.B. "knocked it out of [her] hand." Overton was unsure if she put any more seasoning in the cup before A.B. grabbed the cup and started drinking again. Overton did not think that A.B. drank all of the mixture. On cross-examination, Overton stated that Zatarain's is chili powder.

According to Overton, A.B. then decided that the Zatarain's and water mixture was not "good enough" and asked for some "chili." Overton stated, "He threw the—well, he started throwing a fit and he went into—he was in the living room at this point throwing a fit, throwing himself down on the ground again. Then he threw the sippy cup at [her]. . . . And then he continued to throw a fit for about 20 minutes or so. . . . [H]e was throwing a fit and then he stumbled to the floor. And he looked up at [her] and said he was cold and threw up." Overton thought that A.B. had vomited because he had become too excited. Therefore, Overton explained that she did not think he was sick because A.B. had vomited in the past due to his excitement. She stated, "I thought that he had gotten himself so worked up that he threw up." A.B. again told Overton that he was cold, so she thought that "maybe he had worked himself, you know, too much in this fit and he's now gotten himself sick from throwing a fit." Overton called Larry and told him that A.B. was

31

"freaking out" and he needed to come home.  Overton grabbed some rags from the garage and began cleaning the vomit, and according to Overton, A.B. began helping her clean. Then A.B. stopped helping her clean and started "shaking."  A.B. again told Overton that he was cold, so she wrapped him in some blankets.  According to Overton, when she asked A.B. what was wrong, he did not respond; however, A.B. did walk to the bedroom. Overton stated that because A.B. was so cold, she wrapped him in his sleeping bag, a Spiderman blanket, and the blanket on her bed; she also placed a heating pad under the blanket.

When Larry arrived home, Overton told him that A.B. was okay.  She informed Larry that she "thought that maybe [A.B.] had overworked himself in this fit but that now he was cold."  Because Overton was not sure what was "going on," she referred to her EMT and nursing books in order to determine whether "you could throw yourself into shock to where you got cold."  When Overton read the section of the book regarding shock, she concluded that "it might be possible that he was in some sort of shock."  On cross-examination, Overton explained that although she thought A.B. was in shock, she did not call 911 because she had "been in shock multiple times and been fine."  Overton also "looked up" hypothermia and determined that A.B. was not suffering from it because he was not in a "cold place."  She then talked to Larry, and they decided to give A.B. a warm bath, hoping it would help warm him.  According to Overton, A.B. was not talking, except that he repeatedly stated that he was cold; then when they put him in the shower, he said, "[N]o, hot."  In her video statement, however, Overton told Detective Hess that after A.B. vomited, he would not talk to her.

Overton testified that when A.B. was in the bathtub, he started "breathing kind of

32

funny like he was congested." Overton believed that his breathing was due to the "shock and stuff," so she remembered that when her other son had pneumonia, "he had a breathing [device] . . . [that] opens up your airway." According to Overton, she did not believe that the device, a nebulizer, would hurt A.B. because she had previously used the device on a little boy when she worked as an LVN. Overton stated that after she used the device on A.B. for a "couple of minutes," A.B. began to breathe better.

Overton and Larry removed A.B. from the bathtub, and she dressed him in sweat pants and a sweatshirt. Overton stated:

> [A.B.] was just moaning. He was ugh . . . ugh . . . ugh. And it was very similar to my—my youngest had had pneumonia a few months before that. And the way he was acting, I described in the video as lethargic; but it was very similar to the way that my son was acting when he had pneumonia, just moaning and just not really wanting to talk or anything. But he was—you know, he wasn't passed out.

In her video statement, Overton told Detective Hess that she believed that "lethargic" meant "[n]ot responding well." Overton called a paramedic friend, whom she sometimes calls for advice when her children are sick. The friend did not answer her phone.

Overton testified that A.B. started "breathing funny again," so she checked his vital signs, including his pulse, examining his pupils, and counting his breaths, which were "normal." On cross-examination, Overton stated that she did not believe that she was qualified as an LVN; however, she felt that she was qualified to check a person's vital signs. According to Overton, she began "thinking that there was more wrong with [A.B.] than just overworking himself." Overton determined that A.B. was sick, she but did not know what was wrong with him, so she and Larry began discussing whether to take A.B. to the doctor. They talked about calling 911, but decided against doing so for two reasons:

33

(1) they did not have insurance; (2) A.B.'s vital signs were allegedly normal, and "they wouldn't get lights and sirens if [they] called an ambulance." According to Overton, at this point, A.B. became less and less responsive, and she realized that the situation was "serious." Until this point, Overton asserted that she did not realize that A.B. was seriously ill because his symptoms were similar to symptoms her other children exhibited when they had "the flu." Before taking A.B. to the doctor, Overton called her paramedic friend again to ask if there was "some weird flu going around; but again, she didn't answer the phone." On cross-examination, Overton agreed that if she had called 911, members of her church would have helped pay the medical bills.

Larry and Overton then got in the car, and Larry drove to UCC, while Overton sat in the backseat with A.B. Overton stated that "when [they] got in the car [A.B.] was acting sick, but he wasn't that sick. And we were driving—or we didn't know he was that sick. Obviously he was. . . ." Larry called his mother to inform her that they would not be meeting at a restaurant for dinner because they were taking A.B. to see the doctor. Overton called Billeaux to ask for the necessary forms that she forgot at home and to inform her that A.B. was going to see the doctor. According to Overton, she explained to Billeaux that A.B. was breathing "funny" and was not "responding well." Overton stated that they decided to take A.B. to UCC because it was "closer and faster."

Overton testified that when they stopped at a red light, A.B. stopped breathing, so she began CPR. Overton stated that A.B. vomited in her mouth, and he started breathing again. While Overton was performing CPR on A.B., Larry called Rich Miotti, a pastor and family friend, to tell him that they "were on the way to the hospital," and Miotti stated he

34

would meet them there.[32]  When the State asked Overton on cross-examination why she did not call 911 when A.B. stopped breathing in the car, Overton responded, "How was calling 911 going to get us [there] any faster?  We were at the light right straight from—we were at the closest light to a place where we thought they had a crash cart and would be able to help us."  The State asked Overton to explain how calling Miotti would help, and Overton responded, "He was going to be able to pray for [A.B.]"  The State asked Overton to clarify when A.B. stopped breathing again because he was limp and not breathing when he arrived at UCC.  Overton explained that A.B. stopped breathing again in the UCC parking lot when Larry took him out of the car, and that his pupils dilated immediately.

Overton stated that while at UCC, the staff appeared overwhelmed and were unable to locate necessary equipment, so according to Overton, she "may have tried to smile" at a nurse "in frustration."  According to Overton, she is usually calm in "tragic situations."  Overton testified that she explained what had happened to A.B. "probably 15 or 16 times," and that when she told a doctor at UCC what happened, he informed her that A.B. "had probably choked on the chili, when he threw it up, that he probably choked on his throw-up.  And so that's what [she] thought had happened."  On cross-examination, Overton denied telling the staff at UCC that A.B. choked on chili, and stated that she did not notice A.B. choking.

On cross-examination, Overton theorized that she caused the bruise on A.B.'s nose when she gave him CPR in the car and that because A.B. was in cardiac arrest, he would have bruised "very quickly."  Overton stated that she believed A.B. caused all of the scratches on his body, but also stated that many of the scratches were caused by the

---

[32] Miotti testified as a witness for the defense.

35

medical staff. Overton denied that she forced A.B. to drink the Zatarain's and water mixture. Overton stated that she did not recall telling Detective Hess that A.B. did not eat before going to McDonald's, but that she was very confused and overwhelmed when she talked to Detective Hess. When the State asked Overton why she did not inform Billeaux that she could not take A.B. to the doctor for the injuries on his arm, Overton responded, "I wasn't very concerned about that. I had already taken care of it."

The jury found Overton guilty of capital murder. The trial court sentenced Overton to life imprisonment. The trial court denied Overton's motion for new trial after a hearing was held. This appeal ensued.

### III. SUFFICIENCY OF THE EVIDENCE

By her third and fourth issues, Overton challenges the legal and factual sufficiency of the evidence to support her conviction. Specifically, by her third issue, Overton contends the evidence is legally insufficient to establish that she either intentionally or knowingly caused A.B.'s death. As we understand her argument, Overton claims that the evidence is legally insufficient for the following reasons: (1) there was no evidence that she knew sodium could be toxic; (2) "there was no evidence that the Zatarain's seasoning she used, contained high levels of sodium"; (3) the Zatarain's label "contained no warning regarding its contents or use"; (4) an LVN may not provide unsupervised medical care and is not trained to diagnose and treat patients; (5) there was no evidence that Overton delayed getting A.B. to the hospital; (6) there is "no sure successful treatment for hypernatremia [sodium intoxication]"; (7) there was no evidence that Overton "appreciated the serious nature of [A.B.'s] ingestion of sodium in his food"; and (8) there was no evidence that Overton "used EMT skills, short of providing CPR to [A.B.], but was not

36

equipped to know his problem."

In her fourth issue, Overton contends that the evidence is factually insufficient because: (1) she was cooperative with law enforcement; (2) she gave a voluntary statement to police explaining her interactions with A.B. and what he had ingested in her presence; (3) her actions of "rushing [A.B.] to the hospital, giving him CPR, and revealing what she knew he ate and drank shows she tried to save the child, not kill him"; (5) after the car accident, A.B. was examined by emergency personnel, which "showed that she wanted to provide adequate medical care for [A.B.]"; (6) her disclosure to many people of A.B.'s illness and her "help-seeking conduct shows that she was not trying to commit a crime, but was gaining what she needed to help her child"; and (7) "when she was alone, with her god, she prayed for [A.B.'s] speedy recovery, not for forgiveness for any wrongdoing."

## A. Standard of Review

In conducting a legal sufficiency review, we view the relevant evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[33] We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact.[34] Instead, we consider whether the jury reached a rational decision.[35]

In reviewing the sufficiency of the evidence, we should look at events

---

[33] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)); *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004).

[34] *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).

[35] *Beckham*, 29 S.W.3d at 151.

37

occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act. Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.[36]

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or is against the great weight and preponderance of the evidence.[37] This Court will not reverse the jury's verdict unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict.[38]

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge.[39] "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."[40] A hypothetically correct charge would instruct the jury to convict appellant of capital murder if she intentionally or knowingly caused the death of an individual under six years of age.[41]

**B. Jury Poll**

---

[36] *Hooper*, 214 S.W.3d at 13 (internal quotations and citations omitted).

[37] *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

[38] *Id.* at 417.

[39] *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd).

[40] *Malik*, 953 S.W.2d at 240.

[41] *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003), § 19.03(a)(8).

By a sub-issue, Overton argues that the result of the post-verdict jury poll limits this Court's review only to evidence supporting the State's theory that she intentionally or knowingly caused A.B.'s death by omission. Overton alleges that we cannot review the sufficiency of the evidence supporting the State's theory that she intentionally or knowingly caused A.B.'s death by causing A.B. to ingest a substance or substances containing acute toxic levels of sodium.[42] The State replies that limiting our review to one theory presented would "amount to an unauthorized narrowing of the jury's verdict or, in effect, a special verdict." It argues that for purposes of an evidentiary sufficiency analysis, when a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld.[43]

The Texas Code of Criminal Procedure generally states that "[t]he verdict in every criminal action must be general," and does not allow for a special verdict detailing the jury's underlying findings thereon.[44] Thus, submission to the jury in the form of a general verdict is required even if different ways of committing one offense are charged.[45]

In *Zuniga v. State*, the jury returned a general verdict finding the defendant guilty of manslaughter, but included handwritten notes which indicated that it had agreed on only

---

[42] We note that Overton nonetheless challenges the sufficiency of the evidence supporting a finding that she intentionally or knowingly caused A.B.'s death by causing him to ingest toxic amounts of sodium.

[43] *See Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002); *see also Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (en banc) ("It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted.").

[44] TEX. CODE CRIM. PROC. ANN. art. 37.07 § 1(a) (Vernon Supp. 2008); *Zuniga v. State*, 144 S.W.3d 477, 487 (Tex. Crim. App. 2004), *overruled on other grounds by Watson*, 204 S.W.3d at 405.

[45] *Escobedo v. State*, 805 S.W.2d 860, 861 (Tex. App.–Corpus Christi 1991, no pet.) (citing *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987)).

39

one of the three possible means by which the defendant committed the offense.[46]  The

Court of Criminal Appeals refused to consider those notes as limiting the lower court's

evidentiary sufficiency analysis, stating:

> Where the Court of Appeals erred, however, was in its failure to consider all
> the evidence. . . .  The court's interpretation of the jury's notes on the verdict
> form would equate to a special verdict, in violation of Texas Code of Criminal
> Procedure article 37.07 section 1(a), stating that "The verdict in every
> criminal action must be general."  In *Kitchens v. State*, 823 S.W.2d 256, 258
> (Tex. Crim. App. 1991), we stated, "It is appropriate where the alternate
> theories of committing the same offense are submitted to the jury in the
> disjunctive for the jury to return a general verdict if the evidence is sufficient
> to support a finding under any of the theories submitted."  So, the Court of
> Appeals erred in treating this like a special verdict and by attempting to
> interpret the jury's handwritten notes.  *See Statler v. United States*, 157 U.S.
> 277, 279, 15 S. Ct. 616, 39 L. Ed. 700 (1895), stating "The verdict being
> general and not special, any words attached to the finding . . . are clearly
> superfluous and are to be so treated . . . a general finding of 'guilty' will be
> interpreted as guilty of all that the indictment well alleges. . . .  Surplusage in
> a verdict may be rejected. . . ."  Despite the jury's handwriting and the trial
> court's reading and receipt of the verdict, this is a general verdict of guilty of
> manslaughter.  Therefore, the Court of Appeals should not have disregarded
> the evidence of speeding and passing in a no-passing zone for purposes of
> the factual sufficiency analysis.[47]

Accordingly, because the jury in this case returned a general verdict, we cannot in our

sufficiency review disregard evidence supporting a finding that Overton intentionally or

knowingly caused the child's death by causing him to ingest toxic levels of sodium.[48]

Therefore, in evaluating the sufficiency of the evidence, we will not limit our review by the

result of the jury poll.

## C.  Analysis

---

[46] *Zuniga*, 144 S.W.3d at 480.

[47] *See id.* at 486-87.

[48] *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 1(a); *Zuniga*, 144 S.W.3d at 486-87.

Here, the indictment alleged that Overton caused the death of A.B., a child younger than six years of age, by either causing him to ingest acute levels of sodium or by failing to provide or seek medical care for him.  Thus, the State had to prove that Overton either intentionally or knowingly caused A.B.'s death by either of the means alleged in the jury charge.[49]  A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result.[50]  A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.[51]  Therefore, Overton acted intentionally if it was her conscious objective or desire to cause A.B.'s death by either causing him to ingest acute levels of sodium or by failing to provide medical care; Overton acted knowingly if she was aware that her conduct of causing A.B. to ingest acute levels of sodium or failing to provide medical care was reasonably certain to cause his death.

A culpable mental state is invariably proven by circumstantial evidence.[52]  The establishment of culpable mental states is often grounded upon inferences to be drawn by the factfinder from the attendant circumstances.[53]  Mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs.[54]  A culpable mental state may be inferred from circumstantial evidence

---

[49] *See Malik*, 953 S.W.2d at 240.

[50] TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003).

[51] *Id.* § 6.03(b).

[52] *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.–Houston [14th Dist.] 2007, no pet.).

[53] *Lane v. State*, 763 S.W.2d 785, 787 (Tex. Crim. App. 1989).

[54] *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991).

such as acts, words, and conduct of the defendant and surrounding circumstances.[55]

Intent is a question of fact to be determined by the trier of fact from all of the facts and circumstances in evidence.[56]  A jury may infer intent from the acts and words of the defendant, the manner in which the offense was committed, the nature of the wounds inflicted, and the relative size and strength of the parties.[57]  "The trier of facts may infer intent to kill from any facts in evidence which, to his mind, proves the existence of such intent to kill."[58]  The threshold of proof necessary to support a jury finding of an awareness that such a result is reasonably certain to occur is concomitantly low.[59]

> A "consciousness of guilt" is perhaps one of the strongest kinds of evidence of guilt.  It is . . . a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged.[[60]]

The making of false statements can be evidence of a "consciousness of guilt."[61]

## 1.  Evidence Supporting Verdict

### a.  Overton's Acts, Words, and Consciousness of Guilt

---

[55] *Guevara*, 152 S.W.3d at 50.

[56] *Hemphill v. State*, 505 S.W.2d 560, 562 (Tex. Crim. App. 1974); *Martin*, 246 S.W.3d at 263.

[57] *Martin*, 246 S.W.3d at 263; *Nickerson v. State*, 69 S.W.3d 661, 667 (Tex. App.–Waco 2002, pet. ref'd) (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (en banc); *West v. State*, 846 S.W.2d 912, 914 (Tex. App.–Beaumont 1993, pet. ref'd)).

[58] *Gutierrez v. State*, 672 S.W.2d 633, 636 (Tex. App.–Corpus Christi 1984) (citing *Palafox v. State*, 484 S.W.2d 739 (Tex. Crim. App. 1972)); *see Lee v. State*, 866 S.W.2d 298, 302 (Tex. App.–Fort Worth 1993, pet ref'd) ("A 'consciousness of guilt' may be one of the strongest indicators of guilt.") (citing *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.–Austin 1990, no pet.)).

[59] *Lane*, 763 S.W.2d at 787.

[60] *Torres*, 794 S.W.2d at 598.

[61] *See King*, 29 S.W.3d at 565 (concluding that evidence that connected the appellant to the crime included, among other things, " appellant's false statements to the media— indicating consciousness of guilt and an attempt to cover up the crime").

42

In her video interview with Detective Hess, Overton stated, "[A] long time ago I was an EMT so I knew to check [his pupils], but he was—his pupils were reacting, he was breathing. . . ." Overton explained, "I had a box with all kinds of medical stuff, all my old stuff from EMT and it was in that box. And I pulled everything out looking for something that I could use that would help him. . . ."[62]

Overton stated, "I asked [A.B.] what was wrong. He didn't talk to me. He said 'I'—no he did. He said 'I'm cold'. And then he threw up and then he sat there for a while. . . . [H]e was like real pale and I realized something was wrong." Overton informed Detective Hess that after A.B. started shaking and stopped talking, she "got scared because she couldn't get him to talk to [her]." Overton informed Detective Hess that she decided to administer "Albuterol treatment" (the nebulizer) to A.B. because he was breathing "funny." According to Overton, the "Albuterol treatment" is "a machine with a tube that has oxygen attached to it and it gives oxygen to you. And Albuteral is a breathing drug that they give you for clearing out your lungs." Overton stated that she "was thinking that [A.B.] was sick, something was wrong with him, but we—like that it wasn't something that we couldn't figure out and then take him in to the doctor." However, Overton testified that she did not believe that she was qualified to work as an LVN.

Although Overton insisted that A.B. was not seriously ill, and that the nebulizer helped A.B.'s breathing, she decided to "pull[] out all [her] CPR stuff before we were getting ready to go." Overton also testified that A.B. was breathing better after she used the nebulizer. It was Overton's testimony that there was no reason for her to believe that A.B.

---

[62] According to Gregory, the EMT training included how to support and maintain life while getting to an emergency care facility, such as a hospital, but did not include how to diagnose a particular condition.

needed medical care, which presumably included CPR.  However, Overton administered a device she claimed provided assistance for breathing and "pulled out" items that she was taught to use to administer CPR.

Overton described numerous allegedly unexplained symptoms that A.B. exhibited. The symptoms that Overton told Detective Hess she observed included that A.B.:  (1) stumbled and fell; (2) threw up; (3) was cold; (4) would not talk to her or to Larry; (5) had trouble breathing; (6) was lethargic; and (7) was shaking.  Overton told Dr. Rotta that after ingesting the Zatarain's and water, A.B. was drifting in and out of consciousness.  Overton stated that she believed that A.B. was in shock, but that she still did not call 911.[63] Moreover, when Overton first thought that A.B. was in shock, she did not seek any medical care for him and, instead, decided to treat him herself, even though she testified that she did not believe she was qualified as an LVN.[64]  Overton told Zapata that A.B. had "passed out" on October 2, the day he was taken to UCC, and that he had also passed out on October 1.  However, Overton did not inform Dr. Rotta that A.B. had previously "passed out" on October 1.  Furthermore, Overton did not indicate to Dr. Jakubowski that A.B. had any recent medical problems, and stated that A.B. was not "sick too much."

Overton told Detective Hess that she and Larry discussed calling 911, but decided against it because A.B. was not insured.[65]  Overton stated that she "wasn't thinking" or she

---

[63] Dr. Rotta testified that as a pediatric critical care specialist, he sees only the most critically ill children, including those who have severe infections and shock.

[64] According to Gregory, during the EMT training that she and Overton attended,  the signs of shock were covered "extensively."  Dr. Rotta opined that if a patient goes into shock, it is much harder to resuscitate that patient.

[65] Although Overton claimed that she did not have the necessary paperwork to get Medicaid for A.B., Billeaux testified that Overton could have acquired medical insurance for A.B. in June after the placement was made.  Furthermore, Overton admitted that church members would have assisted in paying for A.B.'s medical

44

would have "just taken [A.B.] to the hospital" and that as an EMT, she "was just trying to fix it . . . . "[66] Detective Hess asked Overton, "So he was in a traumatic event for an hour and 44 minutes?" Overton responded, "Yes. I didn't realize it was that long, but yes." Furthermore, Overton admitted that she was "scared" when A.B. stopped talking, but instead of calling 911, she called her husband and asked him to come home.

Overton gave conflicting stories about what happened to A.B. and could not explain A.B.'s symptoms and injuries. Overton told Haller and Gregory that A.B. had been vomiting and defecating on purpose on October 2. When Patricia Gonzalez, a medical assistant at UCC, asked Overton what happened to A.B., Overton informed her that A.B. was watching T.V. in the living room, then Overton took away A.B.'s toy, he began crying, and Overton left him alone to cry. Overton thought that A.B. fell asleep, so she did not check on him. Apparently, at some point, Overton checked on A.B., and they left for UCC; while en route, A.B. "passed out." Gonzalez stated that it did not appear that A.B. had "just passed out." Furthermore, Overton told Detective Hess that when A.B. stumbled, it was not because he "passed out" and that A.B. was awake. Overton testified that A.B. stopped breathing while Larry drove them to UCC and that A.B. began breathing again after she gave him CPR in the car, but that when they were in the parking lot at UCC, he stopped breathing again.

Overton told Dodge and Billeaux that A.B. "choked" on chili. McAllister testified that Overton told him that A.B. might have choked when he ate some chili, and that she thought

---

bills.

[66] We note that Overton concedes on appeal that she does not have the necessary training to treat sodium intoxication.

45

he was lying down with a full stomach because A.B. gets sleepy when he eats. However, Overton testified that she never told anyone at UCC that A.B. choked on chili. Overton testified that A.B.'s vital signs were normal, and he did not stop breathing at home, which appears to contradict her statements to others that A.B. choked on chili. Overton told Dr. Rotta and Detective Hess that A.B. ate some chili, then wanted more, but she did not want him to eat more, so she gave A.B. a sippy cup with "chili powder" and water. After A.B. drank the mixture, he stumbled, said he was cold, and became unresponsive.

Overton testified that A.B. wanted the Zatarain's, and that after he threatened to "poop," she gave him a "taste" of the "flavor" to calm him down. Overton further testified that after tasting the water mixed with Zatarain's, A.B. asked her to put more Zatarain's in the cup, which she did. However, Overton told Dr. Rotta that she decided to give A.B. the Zatarain's mixed with water and that A.B. drank the mixture "to her surprise."

In her video statement, Overton told Detective Hess that she fed A.B. some "chili" with Zatarain's and that after he finished eating, he wanted more food. Overton stated that she told A.B. he had just eaten a big bowl of food, so she mixed some water with chili powder. Overton told A.B. that if he wanted the water and chili powder, he could have it. According to Overton, she believed that A.B. wanted the Zatarain's because he was asking for more "chili," and the chili had Zatarain's seasoning in it. Overton stated that she "didn't think [the Zatarain's and water mixture] would hurt him."[67] Later, during the interview, when Detective Hess again asked Overton about spices in her home and the chili powder, Overton stated that she put one "scoop" of Zatarain's in A.B.'s water, but that he wanted

_____

[67] At this point of the interview, Detective Hess had not informed Overton that A.B. was suffering from sodium intoxication. Later in the interview, Detective Hess told Overton that the cause of A.B.'s symptoms was sodium intoxication, and she appeared surprised.

46

more, and that she may have put more Zatarain's and some garlic in the water. When Detective Hess finally informed Overton that A.B. had "twice the normal human being's amount of salt," Overton stated, "He didn't have salt in the water. I don't know. What causes that." Detective Hess asked Overton how A.B. could have ingested such a high level of salt, and Overton theorized that A.B. somehow "got into the salt" and may have put salt in his sippy cup. When Detective Hess asked Overton to explain the bruise on A.B.'s stomach and his head injury, Overton insisted that she did not know how he was injured. She stated that when he "stumbled," she did not think he hit his head.

Overton testified that she "looked up" hypothermia and determined that it was not the cause of his symptoms. However, Overton told Detective Hess she was holding A.B. upright in the car instead of laying him down because she read in her EMT book that the proper treatment for hypothermia is to keep the person's head "straight."

Dr. Rotta testified that he believed that Overton was not forthcoming or entirely truthful with him concerning what happened to A.B. According to Dr. Rotta, getting A.B.'s medical history from Overton was "like pulling teeth." Dr. Rotta opined that Overton's description of the time line of events was "unusual." Dr. Rotta was convinced that a crime had been committed. Detective Hess testified that Overton called Haller after A.B. stumbled and vomited. Detective Hess stated, "I got that [A.B.] had stumbled, he had thrown up, and then that's when [Overton] went to call . . . [Haller]." Haller testified that Overton told her that A.B. had "puked" and had defecated eight times that day. According to Overton, A.B. ate the chili, drank the Zatarain's and water, stumbled, and vomited. However, when she called Haller, she told Haller that A.B. was not sick but that he was deliberately "pooping" to "get" to her.

47

Billeaux testified that Overton planned to enroll A.B. in Medicaid. According to Billeaux, Overton was provided all of A.B.'s important documents. Overton talked to someone at "Human Services," who told her to bring in the paperwork she received from CPS, and A.B. would be enrolled in Medicaid. However, Overton testified that she did not have the necessary paperwork, and therefore, she was unable to enroll A.B. in Medicaid. Overton told Billeaux that A.B. was having temper tantrums, but that "because A.B. was not hurting himself," she allowed him to cry and asked him "once in a while" to calm down if he wanted to play. However, Overton testified that when A.B. "threw" a "fit" he would "throw himself to the floor or bang his head on the wall."

Gonzalez testified that Overton had a smile on her face when she was performing the chest compressions on A.B. Zapata described Overton's facial expression while at UCC as a "smirk." Zapata considered Overton's response as unusual. Dr. Jakubowski testified that Overton was nervously laughing when she was at UCC.

### b. A.B.'s Injuries

A.B. had numerous unexplained injuries, including a sub-scalp hemorrhage that Dr. Fernandez opined was an impact or trauma-type injury and which was not caused by the high sodium level. According to Dr. Fernandez, A.B. would have been "dazed, maybe becoming unconscious," and may have had "some vomiting also with it, seizure type activity. . . . " Overton herself described A.B.'s behavior as "lethargic" and "unresponsive." Overton told Dr. Rotta that after A.B. drank the Zatarain's and water mixture, he was "drifting in and out of consciousness."

Dr. Rotta requested that a forensic nurse take pictures of A.B.'s injuries due to the number of injuries visible on A.B.'s body. Dr. Rotta could not state how many scratches

48

he observed on A.B.'s body. According to Dr. Rotta, someone commented that it "appeared that [A.B.] had been in a fight with a porcupine." Dr. Rotta described the bruise on A.B.'s buttocks as a "fresh . . . red injury" that was consistent with A.B. spending a "significant amount of time flat on a hard surface. . . . [or] if the child were to be hit on this area." Dr. Rotta expressed that he was "dealing with a child that [had] evidence of multiple injuries" who was "barely alive." State's Exhibit 30 depicted what Dr. Rotta described as a bruise to A.B.'s arm that could have been caused by someone forcefully squeezing the arm. There was also bruising on the front part of A.B.'s shin and on his knee.

Overton told Haller and Gregory that A.B. had defecated and vomited numerous times on October 2. From Gregory's testimony, the jury could have believed that A.B. had vomited eight times earlier in the day, suggesting that A.B. was exhibiting the symptoms of sodium intoxication much earlier than when Overton claimed A.B. drank the Zatarain's and water mixture. Based on Haller's testimony, the jury may have concluded that A.B. became ill from the sodium intoxication before 2:52 p.m., which was when Overton called Haller and said A.B. had defecated eight times and vomited. According to Overton's statement to Zapata, A.B. not only "passed out" on October 2, but he had also "passed out" on October 1. Overton told Detective Hess that after she gave A.B. the water and Zatarain's, A.B. stumbled and vomited. Overton stated that she gave the chili to A.B. at approximately 2:00 or 2:30 p.m. and that he ate for about forty-five minutes before "stumbling." Overton called Larry at 3:30 p.m.; she did not ever call 911, and she did not take A.B. to UCC until 5:17 p.m.

According to Overton, A.B. stopped breathing en route to UCC. However, the State presented evidence that A.B. may have stopped breathing earlier than Overton claimed.

49

Overton told Detective Hess that A.B. was having trouble breathing and that it concerned her enough to put him on a nebulizer. Overton told Detective Hess that she used the nebulizer on A.B. because he was breathing "funny." Mitchell testified that Overton stated that A.B. quit breathing after he ate the chili. Overton also told Mitchell that A.B. ate the chili; he was being punished; she put him aside; and by the time she looked at him, he had stopped breathing. Zapata testified that Overton told her that A.B. vomited, passed out, and then stopped breathing. When A.B. arrived at UCC, his pupils were dilated by five milliliters. Zapata testified that the pupil dilation indicated that A.B. was "brain dead." Dr. Jakubowski stated the pupil dilation indicated that A.B. was "already dying." Dodge reported that A.B.'s pupil dilation was an indication that he was dead on arrival.

Overton told Detective Hess that she thought that when A.B. said he was cold, that he may have "thrown himself" into shock. Overton testified that she referred to her EMT book because she thought A.B. was in shock and attempted to treat him herself. Furthermore, Overton told Detective Hess that when Larry went into the bedroom, "[Larry] said, 'Let's try and put him in a hot.'—or 'warm shower, see if we can get him to wake up'. . . ." Overton told Detective Hess that while Larry held A.B. under the "warm shower," Larry stated, "Wake up, [A.B.]. Are you okay [A.B.] Talk to me [A.B.]" From this evidence, a jury may have found that A.B. was unconscious when Larry and Overton allegedly put A.B. in the shower.

According to Drs. Rotta and Fernandez, the cause of A.B.'s death was acute sodium intoxication. Dr. Rotta testified that there is a significant amount of salt in Zatarain's seasoning and calculated that to have acquired the amount of sodium found in his blood, A.B. must have ingested twenty-three teaspoons of Zatarain's seasoning. Overton

admitted that she fed Zatarain's mixed with water to A.B. in a sippy cup. Dr. Rotta testified that "chili powder" is not suitable for a child. According to Overton's account, A.B. stumbled and vomited after he drank the water and Zatarain's mixture.

Overton argues that although she was an LVN and trained EMT, she did not have enough medical training to diagnose and treat sodium poisoning. However, A.B. was exhibiting the final symptom of sodium intoxication—cardiorespiratory arrest—when he was brought to UCC. According to Dr. Rotta, a person suffering from sodium intoxication would have exhibited symptoms of discomfort, extreme thirst, more discomfort, changes in consciousness, changes in behavior, trouble breathing, loss of consciousness, seizures, and finally, cardiorespiratory arrest. The patient would stop breathing before going into cardiac arrest. When Overton brought A.B. to UCC, he had already suffered a cardiac arrest due to the effects of severe sodium intoxication. Dr. Rotta testified that it is very difficult for a child to survive an illness after he has gone into an out-of-hospital cardiac arrest, which typically occurs after respiratory arrest. Although Overton consistently maintained that A.B. did not suffer any seizures, Dr. Fernandez testified that the bite mark on A.B.'s tongue was the type that commonly occurs during "seizure type convulsions." Furthermore, when describing the symptoms A.B. would have exhibited, Dr. Rotta opined that within one hour to an hour-and-a-half of the salt intoxication, one would "see loss of consciousness [and] seizures."

As the finder of fact, it was up to the jury to resolve any inconsistencies in the witnesses's testimony.[68] Moreover,

---

[68] *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982) ("Reconciliation of conflicts and contradictions in the evidence is within the province of the jury, and such conflicts will not call for reversal if there is enough credible testimony to support

51

[w]e do not resolve any conflict of fact or assign credibility to the witnesses, as it was the function of the trier of fact to do so. Instead, our duty is only to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a light most favorable to the verdict. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict.[69]

Here, the jury could have inferred that A.B. suffered from discomfort, extreme thirst, changes in consciousness, changes in behavior, trouble breathing, loss of consciousness, seizures, respiratory arrest, and finally cardiac arrest. The jury was free to disbelieve Overton's testimony that A.B. stopped breathing en route to UCC, and free to believe that Overton did not seek medical care until A.B. suffered a cardiac arrest. Furthermore, the jury was free to believe A.B. stopped breathing earlier than Overton claimed, based on: (1) Zapata's and Mitchell's testimony that Overton stated that A.B. stopped breathing after Overton gave him the water and Zatarain's mixture; (2) Overton's statement to Detective Hess that when Larry held A.B. in the shower, Larry said "Wake up, A.B."; and (3) the fact that Overton used the nebulizer on A.B. The jury was free to believe the evidence supporting a finding that Overton knew that medical care was required, either when A.B. stopped breathing, went into shock, drifted in and out of consciousness, or suffered a seizure. Furthermore, the jury was free to believe Dr. Rotta's testimony that if Overton had acquired medical treatment for A.B. more "quickly," A.B. would have survived.[70]

Overton further argues that "[t]he early symptoms are not the type for which physicians would expect a parent to seek hospitalization." As support for her argument,

---

the conviction."); *Jimenez v. State*, 67 S.W.3d 493, 505 (Tex. App.–Corpus Christi 2002, pet. ref'd) ("The jury exclusively resolves conflicting testimony in the record.").

[69] *Martinez v. State*, 198 S.W.3d 36, 50 (Tex. App.–Corpus Christi 2006, no pet.) (citations omitted).

[70] *See Jimenez*, 67 S.W.3d at 504.

Overton cites to a portion of the record wherein her expert witness, Judy Melinek, M.D. stated, "If all parents called 911 when their child vomits, our system would be overtaxed." However, there is evidence in the record that A.B. suffered from symptoms more serious than mere vomiting, such as shock, drifting in and out of consciousness, difficulty in breathing, termination of breathing, and seizures. Therefore, even assuming that the jury believed Overton's expert that parents do not need to call 911 when a child is vomiting, it may also have believed that Overton failed to seek medical care for A.B. even when he exhibited much more serious symptoms.

### c. The Manner in Which the Offense was Committed

In her statement to police, Overton told Detective Hess that she mixed Zatarain's and water in a large tumbler, but because she thought that it could make A.B. sick, she poured a smaller amount of the mixture into a sippy cup. Overton stated that she "thought if it was in a sippy cup and if it was—if he didn't like it, he wouldn't drink it." However, Overton also testified that A.B. insisted on drinking water mixed with Zatarain's seasoning, and even demanded more Zatarain's after tasting the water. Overton stated that she put "a couple of sprinkles" of Zatarain's seasoning in a cup for A.B., but then decided that it was "too much," so she poured some of the mixture into a sippy cup and gave it to A.B. to drink. Although Overton claimed that she only put one teaspoon of Zatarain's in A.B.'s sippy cup, Dr. Rotta testified that it would take twenty-three teaspoons of Zatarain's to cause the level of sodium found in A.B.'s blood. From the evidence, the jury could have reasonably concluded that Overton put twenty-three teaspoons of Zatarain's in A.B.'s sippy cup, knowing that it would make him sick.

There was some evidence supporting a finding that Overton forced A.B. to drink the

53

Zatarain's and water mixture. The evidence demonstrated that Overton was alone with A.B. when he became sick from sodium intoxication. Detective Hess asked Overton if there was ever a time after she got home from the chiropractor that A.B. was out of her sight. Overton responded, "No. I don't think so."[71] Dr. Rotta testified that he believed that A.B. was given the Zatarain's and water mixture after A.B. had a temper tantrum, "probably to punish his behavior." Hamil testified that A.B. did not enjoy spicy food, and Overton told Dr. Rotta that she was "surprised" that A.B. drank the Zatarain's and water, allowing an inference that Overton did not expect A.B. to enjoy the mixture. Detective Hess testified that he did not believe that a four-year-old child would want to drink Zatarain's mixed with water. Overton told Mendoza that when A.B. drank the water and Zatartain's, he was kicking and screaming. Dr. Rotta opined that the bruise on A.B.'s nose was consistent with someone pinching it. There were scratches on A.B.'s neck that were consistent with adult fingernail marks. According to Dr. Rotta, the bruise on A.B.'s arm was located in an area of the arm where someone would forcefully hold a child; it was consistent with an adult thumb, which "could have been caused by someone forcefully squeezing the arm." Mitchell stated that there was a large amount of vomit that smelled like chili, but not a lot

---

[71] In *Garcia v. State*, the court of appeals stated:

Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies. *See Bryant v. State*, 909 S.W.2d 579, 583 (Tex. App.–Tyler 1995, no pet.) (where evidence showed child had been left alone with defendant and injuries to child occurred approximately thirty minutes prior to child being brought to emergency room, evidence was sufficient to support conviction); *Elledge v. State*, 890 S.W.2d 843, 846 (Tex. App.–Austin 1994, pet. ref'd) (undisputed medical testimony placing adult defendant alone with child when fatal injuries were sustained supported conviction for injury to a child); *Butts v. State*, 835 S.W.2d 147, 151 (Tex. App.–Corpus Christi 1992, pet. ref'd) (injuries sustained by child established by medical testimony to have occurred at time adult defendant admitted to sole possession of child).

16 S.W.3d 401, 405 (Tex. App.–El Paso 2000, pet. ref'd).

of meat or beans. Mitchell testified that she saw a lot of liquid. Zapata and Dr. Jakubowski both testified that the amount of the vomit was more than expected for a child A.B.'s size.

There is evidence that A.B. suffered severe symptoms requiring medical attention and that Overton did not call 911 or take A.B. to the hospital until he suffered a cardiac arrest.[72] Dr. Rotta opined that the final symptom of sodium intoxication is cardiac arrest. Furthermore, there was evidence that once a child has suffered an out-of-hospital cardiac arrest, the chance of survival is minimal.

## 2. The Evidence is Legally and Factually Sufficient

It was up to the jury, as the trier of fact, to determine whether Overton possessed the requisite mental state from all of the facts and circumstances in evidence.[73] Here, the jury may have inferred Overton's intent to cause A.B.'s death from her acts and words, the manner in which the offense was committed, the nature of the wounds inflicted, and the relative size and strength of the parties.[74] Furthermore, the jury may have inferred Overton's mental state from the attendant circumstances.[75]

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Overton intentionally caused A.B.'s death by either of the theories alleged by the State and that Overton was aware that her conduct of failing to provide or seek medical care was reasonably certain to cause

---

[72] Overton testified that she was an EMT and worked for approximately a year and a half as a licensed vocational nurse. Overton's mother, Lane Hissong, testified that Overton had worked as a nurse for a couple of years and worked with children with disabilities.

[73] *See Hemphill*, 505 S.W.2d at 562; *Martin*, 246 S.W.3d at 263.

[74] *See Martin*, 246 S.W.3d at 263; *Nickerson*, 69 S.W.3d at 667.

[75] *See Lane*, 763 S.W.2d at 787.

A.B.'s death. Therefore, we conclude that the evidence was legally sufficient to support a finding that Overton either intentionally or knowingly caused A.B.'s death. We overrule Overton's third issue.

Moreover, after reviewing the evidence in a neutral light, we cannot conclude that the evidence is so weak that the jury's finding that Overton intentionally or knowingly caused A.B.'s death seems clearly wrong and manifestly unjust or is against the great weight and preponderance of the evidence.[76] Therefore, we conclude that the evidence is factually sufficient to show that Overton intentionally or knowingly caused A.B.'s death. We overrule Overton's fourth issue.

## IV. MOTION TO QUASH INDICTMENT

In her first issue, Overton contends, citing *DeLeon v. State*, that the indictment neither charged her with an offense nor provided notice of the charged offense.[77] Specifically, Overton argues that the indictment "contains no mental state with regard to the omission or 'causing ingestion.'"

### A. Standard of Review and Applicable Law

Whether an indictment is sufficient is a question of law we review de novo.[78] We construe an indictment by reading it as a whole and apply practical rather than technical

---

[76] *Watson*, 204 S.W.3d at 414-15.

[77] *See* 684 S.W.2d 774, 778 (Tex. App.–Corpus Christi 1984, no pet.) (en banc) (per curiam) ("If the defect in the charging instrument is of such a degree as to charge no offense against the law, it is void or fundamentally defective and such a defect may be considered for the first time on appeal.").

[78] *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).

considerations.[79]  "A motion to quash should be granted only where the language concerning the defendant's conduct is so vague or indefinite as to deny the defendant effective notice of the acts he allegedly committed."[80]

"A written instrument is an indictment or information under the Constitution if it accuses someone of a crime with enough clarity and specificity to identify the penal statute under which the State intends to prosecute, even if the instrument is otherwise defective."[81] If the indictment "charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged, and enable the court, on conviction, to pronounce the proper judgment," the indictment is sufficient.[82]  Except in rare cases, a charging instrument that tracks the language of a criminal statute is sufficiently specific to provide a defendant with notice of a charged offense.[83]

## B. Analysis

The indictment in this case tracks the language of the penal code for the felony offense of capital murder.[84]  The capital murder statute states that, "A person commits an

---

[79] *Harrison v. State*, 76 S.W.3d 537, 539 (Tex. App.–Corpus Christi 2002, no pet.) (citing *Oliver v. State*, 692 S.W.2d 712, 714 (Tex. Crim. App. 1985) (en banc); *Soto v. State*, 623 S.W.2d 938, 939 (Tex. Crim. App. 1981)).

[80] *Yanes v. State*, 149 S.W.3d 708, 709 (Tex. App.–Austin 2004, pet. ref'd) (citing *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex. Crim. App. 1988) (en banc)).

[81] *Teal v. State*, 230 S.W.3d 172, 176 (Tex. Crim. App. 2007) (internal quotations omitted).

[82] EX. CODE CRIM. PROC. ANN. art. 21.11 (Vernon 2009).

[83] *State v. Edmond*, 933 S.W.2d 120, 128 (Tex. Crim. App. 1996) (en banc); *DeVaughn*, 749 S.W.2d at 69; *see Trevino v. State*, 228 S.W.3d 729, 734 (Tex. App–Corpus Christi 2006, pet. ref'd).

[84] *See* TEX. PENAL CODE ANN. § 19.03(a)(8); *see also id.* § 19.02(b)(1).

offense if the person commits murder as defined under Section 19.02(b)(1)" and "the person murders an individual under six years of age."[85] Section 19.02(b)(1) defines murder as "intentionally or knowingly caus[ing] the death of an individual."[86] The indictment in this case stated, in pertinent part, that Overton "did then and there intentionally or knowingly cause the death of an individual younger than six years of age." The indictment alleged each element of the offense of capital murder, including the requisite mental state. It required the State to prove beyond a reasonable doubt that Overton intentionally or knowingly caused the death of a child under six years of age. Because the indictment in this case accused Overton of the offense with enough clarity and specificity to identify the penal statute under which the State intended to prosecute her, we conclude that the indictment provided her with sufficient notice of the charged offense.[87] We overrule issue one.

## V. Charge Error

By her second issue,[88] Overton contends that the trial court's charge to the jury was erroneous for several reasons.[89]

---

[85] *Id.* § 19.03(a)(8).

[86] *Id.* § 19.02(b)(1).

[87] *See Teal*, 230 S.W.3d at 176; *Edmond*, 933 S.W.2d at 128; *DeVaughn*, 749 S.W.2d at 69; *see also Trevino*, 228 S.W.3d at 734.

[88] Overton states in her brief that her issues numbered six through twelve "will be argued together"; therefore, we will address these six issues together and refer to them collectively as Overton's fourth issue.

[89] In the section of Overton's brief entitled "Issues Presented," she contends in issues six through twelve that:

VI.     The Jury Instructions Failed to Charge *Mens Rea* for the "Omission" to Provide Medical Care, Violating Due Process. . . .

VII.    The Jury Charge Omitted Mens Rea for the "Omission" to Provide Medical Care Violating

At the charge hearing, Overton stated that she had two objections to the jury charge.[90] The first objection Overton made to the trial court was that the jury charge erroneously included the following language: "that, 'by omission, failed to provide or to seek adequate or timely medical care.'" Overton stated that the basis for her complaint was that "adequate or timely medical care" is not in a statute and "it lower[ed] the State's burden impermissibly." Overton requested that the trial court change the proposed language of the jury charge to state, "by omission, failing to provide or seek medical care." The trial court agreed with Overton, and it deleted "adequate or timely" from the jury charge and included the language Overton requested. To the extent that Overton is complaining

---

Due Process. . . .

VIII.  The Jury Charge Omitted Mens Rea for "Causing the Ingestion" of Sodium, Violating Due Process. . . .

IX.  The Jury Charge Omitted Mens Rea for "Causing the Ingestion" of Sodium, Violating Due Process. . . .

X.  The Jury Charge Shifted the Burden of Proof Regarding *Mens Rea* for Capital Murder in Violation of § 2.01 of the TPC. . . .

XI.  The Jury Charge Shifted the Burden of Proof Regarding *Mens Rea* Violating Due Process. . . .

XII.  The Jury Charge Shifted the Burden of Proof Regarding *Mens Rea* Violating Due Process. . . .

(Emphasis in original.)

[90] At the charge hearing, Overton first objected to the jury charge language and then objected by stating: "I'm going to object to the omission coming in under capital murder, that the statute [section 6.01] is unconstitutionally vague and overbroad and that the law as defined in the definitions can be anything." Section 6.01 of the penal code states, "A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession . . . A person who omits to perform an act does not commit an offense unless a law as defined by Section 1.07 provides that the omission is an offense or otherwise provides that he has a statutory duty to perform the act." TEX. PENAL CODE ANN. § 6.01 (Vernon 2003); *see id.* § 1.07 (Vernon Supp. 2008). Overton argued to the trial court that the legislature "intended [that] injury to a child can be accomplished by omission but not capital murder, that capital murder is a results[-]oriented offense and that it requires a voluntary or knowing act." The trial court overruled Overton's objection that capital murder cannot be accomplished by omission. Overton does not make this argument on appeal.

on appeal that this language is not what is required by the statute,[91] we conclude that Overton has waived this argument by requesting the complained-of instruction she now appears to challenge on appeal.[92]

On appeal, Overton argues, without citation to authority, that "[b]ecause it was based upon an infirm indictment, the jury charge did not charge a felony offense." We disagree. The jury charge required the jury to determine whether Overton intentionally or knowingly caused the death of A.B., an individual under the age of six years. Thus, it correctly instructed the jury on the elements of capital murder. Overton also appears to make the same argument she made in her first issue—that the indictment did not include the requisite mens rea. We have already concluded that the indictment contains all of the elements of capital murder, and we now conclude that the jury charge correctly instructed the jury to find Overton guilty only if she intentionally or knowingly caused A.B.'s death.

Overton next asserts, for the first time on appeal, that the jury charge "negate[d] the requirements that the State show intent or knowledge" because it contained the following three sentences: "A person acts intentionally, or with intent, with respect to a result of her conduct when it is her conscious objective or desire to cause the result."; "A person acts knowingly, or with knowledge, with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result."; "A person is criminally

---

[91] In her brief, Overton states, "Counsel objected that the jury charge lowered the State's burden of proof in violation of due process requirements of the Texas and U.S. consts . . . and that the charge on omission to provide medical care on [sic] was not what was required by the statute. . . ."

[92] See Druery v. State, 225 S.W.3d 491, 505-06 (Tex. Crim. App. 2007) ("We have noted, however, that '[i]f a party affirmatively seeks action by the trial court, that party cannot later contend that the action was error.' Indeed, 'the law of invited error estops a party from making an appellate error of an action it induced.'") (internal citations omitted);see e.g., Polk v. State, 170 S.W.3d 661, 665-66 (Tex. App.–Fort Worth 2005, pet. ref'd) ("Under the doctrine of invited error, a criminal defendant may not create error, whether statutory or constitutional, and then submit that error as a basis for appellate relief.").

responsible if the result would not have occurred but for her conduct." Overton cites *Francis v. Franklin*[93] and *Brown v. State*[94] for the proposition that a mandatory presumption included in the jury charge violates due process.[95] However, we do not agree that these three sentences instructed the jury to make any presumptions in this case. All three sentences appear in a section of the jury charge entitled, "Definitions." The first two sentences provide the statutory definitions of the terms "intentionally," and "knowingly," and the third sentence defines when a person may be held criminally responsible for his conduct. Neither of these definitions required the jury to presume an element of the charged offense.[96]

Furthermore, the application paragraph of the jury charge instructed the jury to find Overton guilty if it found "from the evidence beyond a reasonable doubt that [Overton] . . . intentionally or knowingly cause[d] the death of an individual younger than six years of age." The application paragraph of the jury charge also stated, "Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict 'Not Guilty.'" Therefore, the jury charge did not "negate the requirements that the State show intent or knowledge," as

[93] 471 U.S. 307, 316 (1985).

[94] 122 S.W.3d 794, 799 (Tex. Crim. App. 2003).

[95] *See Franklin*, 471 U.S. at 316 ("An irrebuttable or conclusive presumption relieves the State of its burden of persuasion by removing the presumed element from the case entirely if the State proves the predicate facts."); *Brown*, 122 S.W.3d at 799 ("[A] comment or instruction that states a mandatory presumption . . . violates due process."); *see also Garrett v. State*, 220 S.W.3d 926, 930 (Tex. Crim. App. 2007) ("Mandatory presumptions are unconstitutional because they relieve the State of the burden of proving every element of the offense beyond a reasonable doubt.") (citations omitted).

[96] By a sub-issue, Overton asserts, in one sentence, that "the incomplete section 6.04 instruction substantially lowered the State's burden of proof to strict liability." However, we conclude that Overton has waived this argument on appeal because she neither cites to authority nor supports this assertion with clear and concise argument. *See* TEX. R. APP. P. 38.1(i).

Overton claims.[97]

We conclude that the jury charge did not contain error. Accordingly, we overrule Overton's second issue.[98]

## VI. EXCULPATORY EVIDENCE

By her fifth issue, Overton contends that the State withheld material exculpatory evidence. Specifically, Overton argues that the State did not disclose Dr. Edgar Cortes's opinion that he did not believe that Overton intended to kill [A.B.].

In *Brady v. Maryland*, the United States Supreme Court held that the State must disclose evidence that is favorable and material to a defendant's guilt or punishment.[99] A *Brady* violation is reversible error if the defendant shows: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to the defendant; and (3) the evidence is material.[100]

> Under *Brady*, the defendant bears the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.[101]

> *Brady* material includes information that is known to the prosecution, but unknown

---

[97] Finally, Overton asserts that the jury charge was erroneous because "[t]he charge omits proximate (or legal) causation." However, Overton has waived this assertion because she neither provides citation to authority, nor provides a clear and concise argument. *See* TEX. R. APP. P. 38.1(i).

[98] *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2006) (providing that only if we find error then we must determine whether that error harmed the appellant).

[99] 373 U.S. 83, 83 (1963).

[100] *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).

[101] *Id.* (internal quotations omitted).

to the defense.[102]  Under *Brady*, the State is not required to produce exculpatory information that it does not have in its possession or that is not known to exist.[103] Furthermore, the State does not have a duty to seek out evidence for the defendant's use.[104] An alleged *Brady* violation is analyzed in light of all the other evidence adduced at trial.[105]

In this case, it is unclear from the evidence whether the State actually knew of Dr. Cortes's opinion.[106]  At the hearing on Overton's motion for new trial, Dr. Cortes insisted that he had informed the State of his opinion that Overton did not intend to kill A.B., but the prosecutor, Sandra Eastwood, testified that Dr. Cortes never informed her of his opinion.[107] On cross-examination of Dr. Cortes by the State, the following colloquy occurred:

[The State]:  Doctor[,] did you ever tell the prosecutors that [A.B.'s] behavior, specifically that [A.B.'s] behavior might in your opinion factor into Hanna Overton's state of mind at the time she presumably took—

[Dr. Cortes]:  Yes, I did. . . .  What I simply said it [sic] to both of the [the prosecutors] . . . is that I felt that he was a frustrating child to care for and that that might have factored into some of the things that were done.

[The State]:  Did you ever specifically say that because he was a difficult

---

[102] *United States v. Agurs*, 427 U.S. 97, 103 (1976).

[103] *Hafdahl v. State*, 805 S.W.2d 396, 399 n.3 (Tex. Crim. App. 1990) (en banc) (citing *Thompson v. State*, 612 S.W.2d 925, 928 (Tex. Crim. App. 1981); *Ransonette v. State*, 550 S.W.2d 36, 39 (Tex. Crim. App. 1977)); *Johnson v. State*, 901 S.W.2d 525, 533 (Tex. App.–El Paso 1995, pet. ref'd).

[104] *Palmer v. State*, 902 S.W.2d 561, 563 (Tex. App.–Houston [1st Dist.] 1995, no pet.).

[105] *Hampton*, 86 S.W.3d at 612-13.

[106] *See Hafdahl*, 805 S.W.2d at 399 n.3; *Johnson*, 901 S.W.2d at 533.

[107] We note that the trial court is in the best position to judge the credibility of a witness's testimony. *See Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001); *Brown v. State*, 960 S.W.2d 772, 778 (Tex. App.–Dallas 1997, pet. ref'd).

> child to deal with you did not believe that Hannah Overton intended to kill him at the time.
>
> [Dr. Cortes]: Yeah. That was—I've been very consistent in that from the very beginning that I didn't think it was her intent to kill him or harm him, that I think that this was a case of her trying to discipline a frustrating child to parent and that the discipline went wrong.

However, when Eastwood was asked, "[D]id [Dr. Cortes] ever express an opinion to you to your recollection to the effect that he believed that Ms. Overton did not intentionally kill [A.B.]?", Eastwood replied, "No. I do not recall that at all. My theory all along with the case was knowingly. I never recall having a conversation with [Dr. Cortes] about intentionally. . . ." The State also asked Eastwood if Dr. Cortes had indicated that he "believed" that Overton did not realize the seriousness of A.B.'s condition, and Eastwood responded:

> No. In fact, he kept mentioning situations in the ER room, how parents even come when a child has a fever, that there was no excuse for her doing this. I had no idea he felt this way, and I most certainly would not have had him sit with me to assist me with a deposition with a sodium expert. . . .[108]

Adolfo Aguilo, a member of the prosecution team, testified at the motion for new trial hearing, that "Dr. Cortes never expressed any reluctance to prosecute [Overton] for capital murder. . . . [Dr. Cortes] always appeared to be in agreement with what Dr. Rotta and Dr. Fernandez were saying regarding the case." Because there is conflicting evidence regarding whether the State knew of the alleged exculpatory evidence, we cannot conclude that the information was in fact known to the State or that the State was required to

---

[108] Overton objected to this testimony on the basis that Eastwood's answer was "nonresponsive"; however, Overton did not obtain a ruling on her objection from the trial court. *See* TEX. R. APP. P. 33.1(a)(2).

produce the unknown information.[109]  Therefore, Overton has not met her burden of showing that the State failed to disclose the evidence to her.[110]

However, even if the State knew or should have known that Dr. Cortes did not believe Overton intended to kill A.B. but failed to inform Overton, the prosecution has no duty to disclose inadmissible evidence.[111]  Texas courts have repeatedly excluded expert testimony regarding a defendant's state of mind or intent at the time of the offense because it is speculative and unreliable.[112]  In *Winegarner v. State*, the court of criminal appeals stated:

> In general, our courts permit a witness to testify as to his own intention or other state of mind where the same is material. . . .  On the other hand decisions purporting to apply the opinion rule, uniformly exclude the testimony of a witness as to another person's state of mind.  It is said that since one person cannot possibly know another's state of mind, his testimony is necessarily based on conjecture.[113]

Accordingly, we conclude that Dr. Cortes's opinion of Overton's state of mind or her intent was speculative and unreliable and thus inadmissible.  Even assuming the State knew of Dr. Cortes's opinion, it was under no duty to disclose it, and therefore, there was no *Brady*

---

[109] *See Salazar* , 38 S.W.3d at 148;  *Brown*, 960 S.W.2d at 778.

[110] We note that Overton listed Dr. Cortes as a witness for the defense; however, there is nothing in the record showing that Overton attempted to interview Dr. Cortes before the trial started.

[111] *See Lagrone v. State*, 942 S.W.2d 602, 615 (Tex. Crim. App. 1997).

[112] *See Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997) ("It is impossible for a witness to possess personal knowledge of what someone else is thinking.  The individual is the only one who knows for certain the mental state with which he is acting.  Therefore, if the trial court determines that a proffered lay-witness opinion is an attempt to communicate the actual subjective mental state of the actor, the court should exclude the opinion because it could never be based on personal knowledge.") (internal citation omitted); *Arnold v. State*, 853 S.W.2d 543, 547 (Tex. Crim. App. 1993); *Jackson v. State*, 548 S.W.2d 685, 692-93 (Tex. Crim. App. 1977); *Winegarner v. State*, 505 S.W.2d 303, 305 (Tex. Crim. App. 1974); *Avila v. State*, 954 S.W.2d 830, 839 (Tex. App.–El Paso 1997, pet. ref'd); *Osby v. State*, 939 S.W.2d 787, 788-9 (Tex. App.–Fort Worth 1997, pet. ref'd); *Whitmire v. State*, 789 S.W.2d 366, 372 (Tex. App–Beaumont 1990, pet. ref'd).

[113] *Winegarner*, 505 S.W.2d at 305.

violation.[114]

Moreover, even if we were to assume, arguendo, that this was evidence the State was required to turn over under *Brady* as favorable to the accused, Overton still cannot show that it is reasonably probable that the outcome of the trial would have been different had the statement been disclosed.[115] Dr. Cortes stated that he did not believe that Overton intentionally caused A.B.'s death; however, Dr. Cortes did not testify at the motion for new trial hearing that he believed that Overton did not commit the offense knowingly. Dr. Cortes, in fact, appeared to agree that the killing may have been committed knowingly. Dr. Cortes indicated that he understood that Overton could be convicted of capital murder if she knowingly caused A.B.'s death. The State asked, "Doctor, it's not your testimony that Ms. Overton wouldn't have understood the seriousness of her child's condition at the time, is it, at the time he was suffering from salt intoxication?", and Dr. Cortes replied, "Well, you have to remember that when something like this occurs, you go from being in a normal state to gradually going into a coma. So, I would imagine that at some point she should have known that he was having difficulties and that she should call 911."

Because the jury charge allowed for conviction of capital murder if Overton either intentionally or knowingly caused A.B.'s death, Dr. Cortes's testimony that Overton did not intend to kill A.B. would have still allowed the jury to convict Overton for capital murder if it found she caused the death knowingly. We have already concluded that the evidence is legally and factually sufficient to support a finding that Overton knowingly caused A.B.'s death by omission. Therefore, the mere possibility that Dr. Cortes's opinion might have

---

[114] *See id.*

[115] *See Hampton*, 86 S.W.3d at 612.

66

helped Overton's defense does not establish materiality in the constitutional sense.[116] Accordingly, we conclude that Overton has not shown that there is a reasonable probability that, had the complained-of evidence been disclosed to the defense, the outcome of the proceeding would have been different.[117]  Issue five is overruled.

## VII.  NEWLY DISCOVERED EVIDENCE

By her sixth issue, Overton contends that she is entitled to a new trial because there is newly discovered evidence.  Overton asserts that after the trial, she was able to locate a classmate, Nathaniel DeKoning, who testified at the motion for new trial hearing. Overton asserts that DeKoning's testimony "sheds new light on [her] case."  Overton specifically points to DeKoning's testimony that, during the EMT training he attended with Overton, they were not instructed that sodium was toxic; that "EMTs are not qualified to diagnose or treat patients"; and that "EMT training lapses after four to five years, [and] CPR training lapses after two years."  We construe this issue as a challenge to the trial court's denial of Overton's motion for new trial.

A trial court's ruling denying a defendant's motion for new trial is reviewed under an abuse of discretion standard of review.[118]  At a motion for new trial, the trial court is the trier of fact and the sole judge of the credibility of the witnesses.[119]  Article 40.001 of the code of criminal procedure provides that a new trial shall be granted if material evidence

[116] *See id.*

[117] *See id.*

[118] *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

[119] *Melton v. State*, 987 S.W.2d 72, 75 (Tex. App.–Dallas 1998, no pet.) (citing *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995)).

favorable to the accused has been discovered since trial.[120]  A defendant is entitled to a

new trial if:  (1) the newly discovered evidence was unknown to him at the time of trial; (2)

his failure to discover the new evidence was not due to his lack of due diligence; (3) the

new evidence is admissible and not merely cumulative, corroborative, collateral, or

impeaching; and (4) the new evidence is probably true and will probably bring about a

different result in a new trial.[121]  Failure to establish any of these essential requirements

supports a refusal to grant a new trial.[122]

Evidence that EMT and CPR training lapses after a certain period of time is not

newly discovered evidence; this information is widely available to the public and was

available to Overton at the time of trial.  Evidence that EMTs are not qualified to diagnose

or treat patients is cumulative evidence because Gregory testified at trial that an EMT is

not taught to diagnose or treat patients.  Finally, evidence that Overton's EMT training did

not include information that sodium is toxic would have been offered, according to Overton,

as a *response* to the "prosecutor interject[ing] into her questioning the notion that the

sodium training was extensive. . . ."  In her motion for new trial, Overton acknowledges that

DeKoning's testimony was impeaching.[123]  At the motion for new trial hearing, David Stith,

one of Overton's trial attorneys, testified that DeKoning's testimony was important to the

case because it "would tend to . . . contradict in some form the testimony of Ms.

---

[120]  TEX. CODE CRIM. PROC. ANN. art. 40.001 (Vernon 2006).

[121] *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003); *Davila v. State*, 147 S.W.3d 572, 577 (Tex. App–Corpus Christi 2004, pet. ref'd).

[122] *Markham v. State*, 644 S.W.2d 53, 55 (Tex. App.–San Antonio 1982, no pet.).

[123] In her motion, Overton stated, "Thus, even impeaching evidence such as [DeKoning's testimony] is 'newly discovered' under Texas law."

68

Gregory."[124]  We conclude that the newly discovered evidence offered by Overton was merely impeaching evidence."[125]  Moreover, it was known to Overton at the time of trial whether or not the EMT class she attended included information concerning the toxicity of sodium.[126]

Even assuming that all of the aforementioned evidence was unknown to Overton at the time trial, she has not shown that her failure to discover the alleged "new" evidence was not due to her lack of due diligence.  In fact, Overton acknowledges in her brief, and the record reflects, that one of her trial attorneys, John Gilmore, testified at the motion for new trial hearing that he did not have time to locate witnesses who attended the EMT training with Overton.  On cross-examination, Gilmore acknowledged that the State provided notice that it would call Gregory as a witness and stated that he did not know whether anyone on the defense team interviewed Gregory before trial.  Furthermore, Eastwood testified that she spoke with Lisa Harris, one of Overton's trial attorneys, concerning Gregory's testimony.  The State asked, "Could you tell us specifically what you told Ms. Harris about Jessica Gregory and what you were going to question her concerning?"  Eastwood responded, "Once I met with [Gregory], I spoke with Lisa Harris

---

[124] We note that John Gilmore, one of Overton's trial attorneys, testified at the motion for new trial hearing that Gregory stated at trial that she and Overton had "extensive training in the area of sodium poisoning."  However, the record reflects that Gregory never mentioned sodium poisoning or intoxication in her testimony.  Gregory stated, "We learned a lot about fluid balances in the body, electrolytes, salines as well, salt balances" when asked by the State, "Did you learn about concentrations of saline and what was safe and what was not safe?"  Gregory also stated, "We had to actually learn how to do a saline—well, an IV in general. And what we call NS9, normal saline nine percent, is what is used most often in starting an IV."  Gregory did not mention salt, saline, or sodium anywhere else in her testimony.

[125] *Wallace*, 106 S.W.3d at 108; *Davila*, 147 S.W.3d at 577.

[126] *See Drew v. State*, 743 S.W.2d 207, 227 n.14 (Tex. Crim. App. 1987) (en banc) ("A new trial is never allowed for the purpose of obtaining evidence that was known and accessible to the defendant at the time the cause was tried, and this is true although the defendant had knowledge of the evidence but failed to communicate it to his attorney.").

about her [Overton's] learning about shock, that it was—that she was—the Defendant was an LVN, that she had had experience working with children as a nurse, that she had—this was a hard class, that there was sodium training, that there was shock training." When asked, Eastwood affirmed that she had specifically discussed sodium balances or sodium poisoning with Harris. Harris did not testify at the motion for new trial hearing, and Overton did not provide any evidence contradicting Eastwood's testimony. Therefore, the evidence supports a conclusion that Overton's failure to discover DeKoning's testimony was due to a lack of due diligence.

Finally, the trial court, as the trier of fact in the case, was in the best position to determine whether this evidence would have produced a different result. The record supports the trial court's ruling that DeKoning's testimony would not probably bring about a different result in another trial. Evidence that the toxicity of salt was not taught to Overton during the EMT classes would not bring about a different result because the jury may have concluded that Overton intentionally or knowingly caused A.B.'s death by failing to provide medical care.[127] Furthermore, evidence that EMT and CPR certifications expire would have had no impact on the verdict. Thus, the record supports the trial court's denial of the motion for new trial; therefore, the trial court did not abuse its discretion in not granting appellant's motion for new trial for newly discovered evidence. Accordingly, we conclude that the trial court did not abuse its discretion by denying Overton's motion for new trial

---

[127] As noted, Gregory did not testify that the class included training that salt was toxic, but instead stated that she learned about IVs and salt balances. We note that DeKoning's testimony at the motion for new trial hearing appears to corroborate Gregory's testimony at trial. Defense counsel asked, "With regard to the running of saline solutions or sodium training, what was the sodium training that you got in this class, basically?" DeKoning responded, "When we studied sodium, it was the relationship to diffusion and osmosis, those processes. We were taught that where sodium goes, water goes. . . . It has to do with [sodium] balance."

based on newly discovered evidence.  We overrule issue six.[128]

## VIII.  EXTRA-RECORD EVIDENCE

By her seventh issue, Overton claims that she is entitled to a new trial because Steven Vetters, an alternate juror, made an allegedly improper comment to the jury. Specifically, Overton argues that Vetters's comment, as an outside influence on the jury, tainted the jury deliberations.  The State responds that Overton has not preserved this issue for our review because the complaint was not raised in Overton's motion for new trial.

As support that the trial court should have granted her motion for new trial because the jury heard extra-record evidence, Overton points to Vetters's affidavit, which the trial court admitted at the motion for new trial hearing.  At the hearing, the trial court admitted the affidavit after Overton informed the trial court that she had raised in her motion for new trial a claim that the jury heard extra-record evidence.  Therefore, Overton argued that the affidavit supported her claim.  However, in her motion for new trial, Overton did not in fact allege that she was entitled to a new trial on the basis of extra-record evidence.[129]

In *Trout v. State*,[130] the defendant filed a timely motion for new trial alleging two acts of jury misconduct supported by two affidavits attached to the motion.[131]  The trial court conducted a hearing on the motion and, over the State's objection, allowed the defendant

---

[128] To the extent that Overton argues that she was "surprised" by either Gregory's testimony or the State's questioning of Gregory, we conclude that she has not preserved error because she did not request a postponement or seek a continuance.  *See Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. 1982) ("The failure to request a postponement or seek a continuance waives any error urged in an appeal on the basis of surprise.").

[129] Furthermore, there is no mention of Vetters or his statement in Overton's motion for new trial.

[130] *Trout v. State*, 702 S.W.2d 618, 619 (Tex. Crim. App. 1985) (en banc) (op. on reh'g).

[131] *Id.*

to raise a third act of jury misconduct that had not been raised in the defendant's motion for new trial.[132]  The trial court denied the defendant's motion for new trial.[133]  The court of appeals concluded that the trial court should have granted the defendant's motion for new trial on the basis of the third act of alleged jury misconduct, which was not included in the motion.[134]  The court of criminal appeals reversed, stating:

> Because the proper function of the affidavits is to support the motion for new trial, we hold that the alleged jury misconduct concerning the [third act] was not properly presented by the motion for new trial, should not have been entertained by the trial court at the hearing on the motion for new trial and was not properly preserved for appeal.[135]

Here, Overton filed a timely motion for new trial; however, the motion did not raise the issue she now raises on appeal.  Therefore, we must conclude, under the reasoning in *Trout*, that the trial court should not have entertained the issue at the motion for new trial hearing because it was not presented in the timely motion for new trial.[136]  We overrule Overton's seventh issue.

## IX. PROSECUTORIAL MISCONDUCT

By her eighth and ninth issues, Overton contends that the prosecutor committed misconduct.  Specifically, Overton alleges that the prosecutor:  (1) "ma[de] [a] false

---

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.* at 620.

[136] *See id.*; *see also State v. Moore*, 225 S.W.3d 556, 570 (Tex. Crim. App. 2007) (concluding that "[s]hould the trial court refuse to limit its ruling to the original motion [for new trial] and grant relief on the basis of the amendment over the State's objection, the appellate court should consider only the validity of the original and any timely amended motion for new trial, and should reverse any ruling granting a new trial based upon matters raised for the first time in an untimely amendment").

statement on TV"; and (2) "engaged in a pattern of misconduct which denied [Overton] a fair trial."

## A. The Prosecutor's Statements to the Media

By her eighth issue, Overton contends that statements by the State to the media denied her a fair trial. Specifically, Overton argues that the Nueces County District Attorney, the Honorable Carlos Valdez, made statements to the media after the trial ended that: (1) violated the "ethical rules governing prosecution conduct" by criticizing the jury's verdict; and (2) accused Overton's lawyers of "suborning perjury" by "[saying] the defense witnesses were paid to lie."[137]

First, Overton complains of Valdez's statement that "[i]n this case, Mrs. Overton killed this boy. She caused his death intentionally, it was not because of omission, she did it intentionally. This resulted in justice." Overton argues, however, that when the jury was polled, "the jurors all stated they convicted Overton for 'omission' . . . not that 'she did it intentionally,' as Mr. Valdez claimed. His statement thus criticized the jury's verdict." We disagree that Valdez's comments "criticized" the jury's verdict. The jury returned a "guilty" verdict. Valdez's statement characterizes the verdict as "justice." Therefore, we conclude that Overton's argument that Valdez violated the "ethical rules governing prosecution conduct" by "criticizing" the jury's verdict is without merit.[138]

---

[137] In her issues presented, Overton states that Valdez violated a gag order issued by the trial court; however, Overton neither provides a clear and concise argument for her claim, nor provides appropriate citations to authorities. Therefore, we conclude that Overton has waived this issue. *See* TEX. R. APP. P. 38.1(i).

[138] We also note that Overton claims, without citation to authority, that she is entitled to a new trial because of the alleged ethical violation. However, "violations of disciplinary rules are to be dealt with by means of the administrative mechanisms set forth within those rules. . . . A violation of a disciplinary rule by the prosecutor, in and of itself, would not mandate a reversal of appellant's conviction." *Brown v. State*, 921 S.W.2d 227, 230 (Tex. Crim. App. 1996) (en banc) (providing that a defendant must show that the disciplinary

Next, Overton complains of Valdez's statement that:

[Overton] had to look all over the nation for some professionals that as long as one pays them, say what one wants they will testify whatever the defense asks. We do not need to do that. We do not need to go all over the country looking for someone to testify for us like we want, and that is what happened in this case.

Overton argues that Valdez violated rule 3.07 of the Texas Disciplinary Rules of Professional Conduct when he made that statement. Overton, without citation to authority, alleges that she is entitled to a new trial because "[Valdez's] ability to use his bully pulpit . . . raised his conduct to a fair trial violation." Overton has not explained how Valdez's comment, made *after* the jury returned a "guilty" verdict, denied her a fair trial.[139] We conclude that this assertion is without merit because Overton has not shown that the alleged disciplinary rule violation deprived her of a fair trial.[140] A violation of a disciplinary rule by the prosecutor, in and of itself, would not mandate a reversal of Overton's conviction unless it denied Overton of a fair trial.[141] We overrule Overton's eighth issue.

## B. Pattern of Prosecutorial Misconduct

By her ninth issue, Overton contends that she is entitled to a new trial because the prosecutor engaged in a "pattern of misconduct" that denied her a fair trial. Specifically, Overton claims that the prosecutor did the following: (1) delayed the proceedings; (2) made inflammatory comments; (3) asked improper questions; and (4) presented false

---

rule violation affected his substantial rights or deprived him of a fair trial); *Armstrong v. State*, 897 S.W.2d 361, 366 n.5 (Tex. Crim. App. 1995) (en banc) (per curiam). Moreover, we conclude that Overton has not demonstrated that the disciplinary rule violation affected her substantial rights or deprived her a fair trial. *See Brown*, 921 S.W.2d at 230.

[139] *See Brown*, 921 S.W.2d at 230; *Armstrong*, 897 S.W.2d at 366 n.5.

[140] It is noteworthy that Overton's sentence was imposed by the trial court and not by a jury.

[141] *See Brown*, 921 S.W.2d at 230; *Armstrong*, 897 S.W.2d at 366 n.5.

74

testimony. By a sub-issue, Overton contends that she was entitled to a mistrial because the State violated the trial court's order in limine and left the impression that the defense withheld information from a witness.

## 1. Standard of Review and Applicable Law

We review allegations of prosecutorial misconduct on a case by case basis.[142] The review is not limited to only the facts of each case but also the probable effect on the jurors' minds.[143] To preserve error for prosecutorial misconduct, a defendant must (1) make a timely and specific objection, (2) request an instruction to disregard the matter improperly placed before the jury, and (3) move for mistrial.[144] Further, an objection at trial must comport with the complaint on appeal.[145]

## 2. Discussion

First, Overton claims that the State's alleged misconduct caused her substantial prejudice when the State allegedly delayed the proceedings because she was unable to present the testimony of Dr. Michael Moritz.[146] Overton cites to several instances in the record wherein the trial court asked the State "to move on" and stated that the questions had been asked and answered.[147] Overton also cites to several instances in the record wherein she objected to the State's questions on the basis that the questions had been

---

[142] *Stahl v. State*, 749 S.W.2d 826, 830 (Tex. Crim. App. 1988) (en banc).

[143] *Hodge v. State*, 488 S.W.2d 779, 781-82 (Tex. Crim. App. 1973).

[144] *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995) (en banc); *see* TEX. R. APP. P. 33.1.

[145] *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

[146] Overton claims that the State delayed the proceedings by "using repetitive questioning, irrelevant questioning[,] and lack of preparation."

[147] In these instances, Overton did not object on any basis.

asked and answered; the trial court sustained all of those objections. However, Overton does not point to any instances in the record, and we find none, where she objected that the State committed prosecutorial misconduct by improperly delaying the trial, or where she complained to the trial court that the State's alleged delay tactics caused her substantial prejudice. Therefore, Overton has not preserved this issue for our review.[148]

Moreover, based on our review of the record, Dr. Moritz's failure to testify at trial was not due to the State's actions. At trial, Gilmore informed the trial court that Dr. Moritz would only be available to testify on one day until 6:10 p.m., when his plane would leave the city. Gilmore suggested that if Dr. Moritz was unable to testify by 1:30 p.m. on that day, the defense team would take Dr. Moritz's deposition during the State's case-in-chief and then present the deposition to the jury. He told the trial court that "One of the prosecutors in the case can go to [another defense counsel's] office or wherever it is set up. [The State] can—we can put him on, they can cross examine him, and then play that for the jury." The State objected on the basis that a judge would not be present to rule on objections. Nonetheless, the trial court granted defense counsel's request and allowed the deposition of Dr. Moritz during the State's case-in-chief. Dr. Moritz's deposition was taken the next day. However, the defense did not offer the deposition testimony into evidence. The trial court asked Overton, "It's my understanding that both of you [Overton and the State] have agreed that [Dr. Moritz] will not be testifying because the deposition was not finished." Overton responded, "Your Honor, the exact agreement we had was that we would stop the deposition and neither side would use the deposition. That was the agreement." This is the only reason given to the trial court for Dr. Moritz's failure to testify.

---

[148] *See Penry*, 903 S.W.2d at 764; *see also* TEX. R. APP. P. 33.1.

Furthermore, at the motion for new trial hearing, Gilmore, the lead defense attorney, testified, on cross-examination, that although he had not watched Dr. Moritz's deposition, he had decided not to offer it into evidence because attorneys he trusted advised him not to do so. Gilmore also testified, "We had an expert [Dr. Moritz] who was on schedule and we had scheduled him several times and he had to cancel. And he was here to testify and the State's case went over for whatever reason. I think it was a juror problem." The trial court then reminded Gilmore that it was known that Dr. Moritz would only be available at certain times and that the State was willing to accommodate the testimony when it became available. The trial court stated, "That was agreed to and then he canceled and the deposition was as a result of him not being able to be here when he should have been. Is that correct?" Gilmore replied:

> I believe we worked a schedule to where we thought we were going to get him here at the end of the State's case. I think the problem was, Judge, that the juror was ill that morning and the State wasn't able to finish their case that morning. We would have been able to put him on that afternoon had it not been for that. And he was not available the next day.

The court asked, "But the Court told you you can subpoena him and [the Court would] make sure that he stays. Is that correct?" Gilmore replied, "That is correct, Judge." There is no evidence that Overton requested that the trial court subpoena Dr. Moritz.

At trial, Overton never complained that the State's actions prevented her from calling Dr. Moritz to testify or prevented her from admitting Dr. Moritz's deposition into evidence. The evidence presented at the motion for new trial hearing shows that Overton did not present Dr. Moritz's deposition for strategic reasons and that delay, if any, was not caused by the State, but was due to a sick juror. Moreover, at the motion for new trial hearing, Overton did not present any evidence that the State prevented her from presenting Dr.

77

Moritz's deposition at trial. Therefore, we cannot conclude that the State delayed the proceedings or that Overton suffered substantial harm due to the State's actions.

Next, Overton asserts that the State made several intentional "inflammatory comments." First, Overton complains that the State asked "whether Det[ective] Hess put Zatarain's in Overton's water." Overton objected to the question on the basis that the State made a "sidebar comment." The trial court sustained Overton's objection, and asked the State to "move on." Next, Overton claims that the State "gave the impression that Overton had a burden of proof and no right to remain silent" when the prosecutor asked Detective Hess, "Let me ask you, have you been contacted by any of the defense attorneys regarding any possible defense theories that they have in this case?" Overton objected to this question on the basis that the defense has "no obligation to disclose any defensive theories." The trial court agreed with Overton and did not allow Detective Hess to answer the question. Finally, Overton complains that the State referred to A.B. as "Little [A.B.]" and "left a photo of [A.B.], in extremis, in sight of the jury, to inflame them." At trial, Overton objected to the State's use of the term "little" to describe A.B. on the basis that the State was making a "side bar" comment. In response, the trial court asked the State to refer to the child by his name, and the State complied. Overton did not object to the complained-of photo; however, the trial court instructed the State to "[r]emove" the picture because it had already been shown.

Overton has neither provided citation to authority, nor provided a clear and concise argument supporting her assertion that the State made intentional "inflammatory" comments, and she does not explain any harm she may have suffered. Therefore, we

78

conclude that she has waived this assertion.[149] Furthermore, at trial, Overton did not object to the complained-of instances on the basis that the prosecutor's questions were intended to inflame the minds of the jury, as she now argues on appeal. Therefore, her argument on appeal does not comport with the objections Overton made at trial.[150] We overrule Overton's ninth issue.

### 3. Motion for Mistrial

By a sub-issue, Overton appears to challenge the trial court's denial of her motion for mistrial.[151] First, Overton cites a portion of the record wherein she requested a mistrial on the basis that the State allegedly violated an order in limine regarding extraneous offenses.[152] Overton appears to argue that the State committed prosecutorial misconduct when it allegedly violated the order in limine. Therefore, we will construe Overton's sub-issue as a challenge to the trial court's denial of her motion for mistrial on the basis that the State violated the order in limine.

A motion for mistrial will only be granted in "extreme circumstances, where the prejudice is incurable."[153] Prejudice is incurable if "the reference [is] clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be

---

[149] *See* TEX. R. APP. P. 38.1(i).

[150] *See id.* 33.1; *Wilson*, 71 S.W.3d at 349.

[151] It appears that Overton contends, through her sub-issue, that the trial court should have granted her a mistrial because the State allegedly violated the trial court's order in limine. Overton does not cite to any authority regarding a motion for mistrial and has not provided a clear and concise argument supporting her assertion. *See* TEX. R. APP. P. 38.1(i). Nonetheless, we will address the issue as we understand it.

[152] Overton also appears to assert that the trial court should have granted a mistrial on the basis that "not once but twice [the State] made implication that we were not telling the truth to this witness and withholding something from this witness." However, Overton has neither provided citation to authority nor a clear and concise argument for her assertion; therefore, it is waived. *See id.* at R. 38.1(i).

[153] *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc).

impossible to remove the harmful impression from the jurors' minds."[154]  In most cases, the asking of an improper question rarely requires the granting of a mistrial, because generally the harm can be cured by an instruction to disregard.[155]

We review the trial court's denial of a motion for mistrial under an abuse of discretion standard.[156]  The factors to be considered in determining whether the trial court abused its discretion in denying a mistrial are:  (1) the severity of the misconduct (magnitude of the prejudicial effect); (2) measures adopted to cure the misconduct (efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct.[157]

Overton alleges that the State violated the trial court's order in limine during its cross-examination of Dr. Melinek, Overton's expert witness.  Before approaching the bench, the State asked, "As far as child abuse, did you study this case carefully in order to determine for certain whether or not there was child abuse?"  At a bench conference, Overton objected to the question stating, "I understand this was cross examination.  I did not ask about child abuse."  Overton neither objected to the question on the basis that the State allegedly violated the order in limine nor did she request a limiting instruction.  The trial court informed the State that because this was cross-examination, the State could not "go into it."  The State continued its cross-examination, asking Dr. Melinek over one

---

[154] *Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998).

[155] *Russeau v. State*, 171 S.W.3d 871, 885 (Tex. Crim. App. 2005) (citing *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)).

[156] *Id.*

[157] *See Hawkins*, 135 S.W.3d at 77; *see also Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

hundred more questions. The trial court then gave the jury a fifteen-minute break. At this

point, Overton requested a mistrial because the State had allegedly violated the order in

limine through its question concerning child abuse. Overton stated:

> I'm making another motion for mistrial based on a question that was asked at the first of the cross-examination of this witness. [The State] asked the witness if she reviewed the record and saw any signs of child abuse. There's a motion in limine that covers that. It's an extraneous offense. She should have approached the bench before she asked the question, and she didn't approach the bench. We had to object in front of the jury.[158]

The trial court denied Overton's motion for mistrial.

A motion for mistrial must be both timely and specific and is timely only if it is made

as soon as the grounds for it become apparent.[159] Here, the objectionable nature of the

State's question was apparent when the State mentioned "child abuse." However, Overton

waited until the State asked over one hundred additional questions before requesting a

mistrial on the basis that the State had violated the order in limine. Overton's motion for

mistrial was therefore untimely and failed to preserve her complaint for appellate review.[160]

Furthermore, Overton neither objected to the complained-of question, nor requested a

mistrial on the basis that the State committed prosecutorial misconduct. Therefore, to the

extent that Overton now complains that she was entitled to a mistrial on the basis that the

---

[158] Overton requested a mistrial on numerous occasions on a variety of grounds. However, on appeal Overton does not challenge the trial court's denial in those other instances.

[159] *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007).

[160] *See id.* at 927; *see also Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004) (en banc) ("We recognize the potential for abuse of a rule allowing a motion for mistrial without a preceding objection or request for instruction to disregard. If a party delays motion for mistrial, and by failing to object allows for the introduction of further objectionable testimony or comments and greater accumulation of harm, the party could no more rely on the untimely motion for mistrial than on an untimely objection."); *Thomas v. State*, 137 S.W.3d 792, 796 (Tex. App.–Waco 2004, no pet.) (concluding that an objection was untimely when the appellant waited to object after the State asked eleven more questions after the complained-of question; and therefore, the appellant did not preserve error).

81

State's question constituted prosecutorial misconduct, we conclude that complaint has been waived.[161]  We overrule Overton's sub-issue.

## 4.  Presentation of False Testimony

Overton also argues that the State committed prosecutorial misconduct by presenting false testimony.  Overton alleges that because the State was "aware that Dr. Cortes exonerated Overton of the offense . . . [the State's] presentation of physician testimony by non-experts in the field coupled with the interested testimony of Det. Hess[162] is the presentation of uncorrected misleading evidence."[163]  Overton argues that the State "deceived the [trial] court by asking" Dr. Rotta if he had considered Dr. Cortes's report.[164] Although Overton does not challenge the denial of her motion for new trial, the argument she makes on appeal was preserved in her motion for new trial.[165]  We will construe this sub-issue as a challenge to the denial of Overton's motion for new trial.

As previously state, we review a trial court's denial of a motion for new trial under an abuse of discretion standard.[166]  "We do not substitute our judgment for that of the trial

---

[161] *See* Tex. R. App. P. 33.1.

[162] Overton alleges that Detective Hess is married to a supervisor at CPS.

[163] Overton complains that Detective Hess "used bullying tactics with witnesses and attempted to cajole and misled [sic] them into making statements which would wrongly incriminate Overton."  However, Overton does not point to the "statements" made by the "witnesses" that allegedly "wrongly incriminate[d]" her. Therefore, we conclude that this complaint is inadequately briefed.  *See* Tex. R. App. P. 38.1(i).

[164] Overton complains that it was improper for the State to ask Dr. Melinek, "And you said that you had reviewed many records in preparation for your testimony.  Didn't you review the records from when [A.B.] was born and the records from Dr. Cortes talking about his health, and weren't they also addressed in the medical records with Dr. Rotta?"  Overton objected on the basis that the records had not been admitted into evidence, and the trial court sustained the objection.  Dr. Melinek did not answer the question.

[165] We note that Overton did not object at trial to the State's questions regarding Dr. Cortes's report. However, Overton was not aware of Dr. Cortes's alleged opinion that she did not intentionally kill A.B. at trial. Dr. Cortes informed Overton of his opinion after the trial had ended.

[166] *Holden*, 201 S.W.3d at 763; *Charles*, 146 S.W.3d at 208.

court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling."[167]

As stated earlier, Eastwood, the lead prosecuting attorney, testified at the motion for new trial hearing that Dr. Cortes never expressed his opinion to her. Although Dr. Cortes insisted that he had informed the State of his opinion, there is conflicting evidence. Given the conflicting evidence presented at the hearing and our deferential standard of review, we conclude the trial court did not abuse its discretion when it denied Overton's motion for new trial on the basis that the State committed prosecutorial misconduct by offering false testimony.[168] We overrule Overton's sub-issue.[169]

## X. EXPERT TESTIMONY

By her tenth issue, Overton contends that the trial court abused its discretion by admitting the opinion testimony of Drs. Fernandez and Rotta. Specifically, Overton argues that the trial court erred when it allowed the doctors' testimony "regarding matters for which [they] employed no methodology, had no scientific basis, and there was an analytical gap between [the doctors'] opinion[s] and [their] basis."

### A. Standard of Review and Applicable Law

---

[167] *Holden*, 201 S.W.3d at 763.

[168] *See Salazar*, 38 S.W.3d at 148; *Tollett v. State*, 799 S.W.2d 256, 259 (Tex. Crim. App. 1990) ("Issues of fact as to jury misconduct raised at a hearing on a motion for new trial are for the determination of the trial judge, and where there is conflicting evidence there is no abuse of discretion where the motion for new trial is overruled.").

[169] Overton asserts that because Eastwood "testified" that Dr. Cortes was a member of the prosecution team, "[s]he was duty bound to seek out the information and present it to the jury to present corrected testimony." However, Overton has neither provided a clear and concise argument for this bare assertion nor provided citation to supporting authority. *See* TEX. R. APP. P. 38.1(i). Therefore, this assertion is waived. *See id.*

83

We review the trial court's ruling on the admissibility of scientific expert testimony under an abuse of discretion standard.[170]  An appellate court should not disturb the trial court's decision if the ruling was within the zone of reasonable disagreement.[171]  An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably and without reference to any guiding rules and principles.[172]

Rule 702 of the Texas Rules of Evidence provides:  "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."[173]  Rule 703 provides that the:

> facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by, reviewed by, or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.[174]

Under rule 702, the trial court determines whether the proponent of the scientific evidence has shown by clear and convincing evidence that the evidence is sufficiently reliable and relevant to assist the jury in understanding other evidence or in determining

---

[170] *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008) (citing *Russeau*, 171 S.W.3d at 881).

[171] *Id.*

[172] *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc); *Malone v. State*, 163 S.W.3d 785, 793 (Tex. App.–Texarkana 2005, pet. ref'd).

[173] TEX. R. EVID. 702.

[174] *Id.* at R. 703.

a fact in issue.[175]

> The subject of an expert's testimony must be "scientific . . . knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."[[176]]

The Texas Court of Criminal Appeals has stated that, "As a matter of common sense, evidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question."[177] In *Kelly*, the court enumerated factors affecting the trial court's determination of reliability of scientific theories for expert testimony.[178] These factors include:

> (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.[[179]]

> In *Nenno v. State*, the court of criminal appeals stated,

---

[175] *Gallo v. State*, 239 S.W.3d 757, 765 (Tex. Crim. App. 2007); *Russeau*, 171 S.W.3d at 881; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 592 (1993).

[176] *Daubert*, 509 U.S. at 589-90.

[177] *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (en banc).

[178] *Id.*

[179] *Id.*

The general principles announced in *Kelly* (and *Daubert*) apply [to all scientific and nonscientific expert testimony], but the specific factors outlined in those cases may or may not apply depending upon the context. We do not attempt, here, to develop a rigid distinction between "hard" science, "soft" sciences, or nonscientific testimony. . . . [T]he distinction between various types of testimony may often be blurred.[180]

The supreme court in *Daubert* emphasized that the reliability inquiry is a flexible one.[181] "Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."[182] "Whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[183]

## B. Dr. Fernandez

At a pre-trial hearing, Dr. Fernandez testified that he is a medical doctor employed as the Nueces County medical examiner. Dr. Fernandez is a licensed physician and completed medical examiner training in 1994-1995. He was employed as a medical examiner in Miami, Florida, from 1995-2002. In 2002, Dr. Fernandez was employed in Dallas as a medical examiner, and in 2003, he became the medical examiner in Nueces

---

[180] *Nenno v. State*, 970 S.W.2d 549, 560 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 725 (Tex. Crim. App. 1999) (en banc).

[181] *Daubert*, 509 U.S. at 594.

[182] *Id.* at 594-95.

[183] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999); *see Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006) ("[B]ecause the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." And when a trial judge determines that a witness is or is not qualified to testify as an expert, "appellate courts rarely disturb the trial court's determination.") (internal citations omitted).

County.  A duty of the medical examiner is to perform autopsies and to determine the cause of death.  Dr. Fernandez has performed "probably close to or about 4,000" autopsies in his career.  Part of Dr. Fernandez's specialty is forensic pathology, which is specialized training in determining the cause of death.

Dr. Fernandez stated, "part of the autopsy procedure is taking samples from the body, fluid samples, blood, fluid from the eye which is called vitreous fluid, and testing those samples for drugs or other chemicals."  According to Dr. Fernandez, the samples that he collects from the body are sent to a certified lab for testing, and the lab is capable of testing the levels of salt in the body.  Dr. Fernandez testified that there are medically recognized tests that can be used to determine whether salt caused a person's death and that he is qualified to collect the samples to be tested by a certified lab.  Dr. Fernandez stated that one way to determine the amount of salt in a person's body is by taking a sample of the blood from the person when he was still alive and testing the level of sodium that is in the serum.  According to Dr. Fernandez, if a person has died from sodium poisoning, there are methods that can be used to determine the cause of sodium poisoning within reasonable medical probability.  Dr. Fernandez testified that:

> [t]he standard procedure is like any other autopsy that the medical examiner has or any other medical examiner case.  It involves looking at the medical records if the person was treated at the hospital, looking at the results of the reports from the hospital, and then looking at any police information from the terminal circumstances that's available, and then doing an external examination of the body, doing an internal examination of the body, an autopsy, looking at the organs, taking sections, removing the organs from the body, then taking sections of the organs to look at the organs for trauma or disease, and also collecting samples from the body, blood samples, fluid samples, and testing those for drugs and chemicals.

Dr. Fernandez also stated that there are methods used to determine the source of sodium

87

poisoning and to determine whether the sodium poisoning resulted from ingestion or some internal problem or disease in the body. According to Dr. Fernandez, the methods used would include examining the contents of the stomach, the small and large bowels, taking samples from the organs to discover if "there's disease processes there that would be another reason that the person could have elevated sodium[,]" and reviewing the sample that was tested at the hospital or the fluid from the eye. When Dr. Fernandez performed the autopsy on A.B., he performed all of the standard tests that he would do in a "normal autopsy."

Dr. Fernandez determined the cause of death, in this case, was acute sodium toxicity with "the contributory condition blunt force head trauma . . . based on review of the hospital records and the reports within the hospital records, the information also obtained from examining the body, looking at the different organs, and then the different tests that were done from samples from the body." According to Dr. Fernandez, he conducted tests to determine whether there were other diseases that could have caused A.B.'s deathand "checked to see if there was ingestion of salt."

Dr. Fernandez stated that he had training and experience in the area of sodium poisoning during medical school. He attended "classes that covered material dealing with patients that had elevated sodium levels, and "treat[ed] patients with elevated sodium levels." Finally, Dr. Fernandez testified that the methods that he employed were "standard operating procedure, standard medical examiner practice."

Overton argues that Dr. Fernandez's opinions are unreliable, not relevant, and have "no methodology or scientific basis." Specifically, Overton complains of Dr. Fernandez's opinions that "this was non-accidental hypernatremia, that this was a homicide, that a

88

contributing factor was head trauma, and that the time which elapsed before treatment caused the death of [A.B.]." Although Overton makes an assertion that Dr. Fernandez's methods were unreliable, she does not provide any support for a conclusion that a medical examiner's methods of performing an autopsy are not reliable or that the theory of forensic pathology is unreliable.

At the pre-trial hearing, Dr. Fernandez stated that his methods were the same methods he would use in any "normal" autopsy and that the methods he employed to form his opinions were the "standard operating procedure" used by medical examiners. Dr. Fernandez testified that he performed the autopsy on A.B. using those accepted methods. Thus, the trial court had ample evidence to conclude that the reasoning or methodology underlying Dr. Fernandez's testimony was valid. Furthermore, Dr. Fernandez's testimony was based on techniques used by medical examiners in forensic pathology, and Dr. Fernandez stated that he performed the autopsy and made his evaluation of the cause of death, according to accepted standards in his field.

Dr. Fernandez based his opinions on his education, training, and experience working as a certified medical examiner trained in forensic pathology. This Court does not examine the strength of Dr. Fernandez's conclusions, but rather examines whether Dr. Fernandez has a scientifically grounded and accepted basis for his conclusions.[184] Given Dr. Fernandez's experience and training, it was clear that his knowledge of forensic pathology and medicine was based on reliable forensic principles which he applied to the facts in this case. Therefore, we cannot conclude that the trial court abused its discretion in allowing Dr. Fernandez to testify at Overton's trial.

---

[184] *See Daubert*, 590 U.S. at 594.

## C. Dr. Rotta

Next, Overton argues that "Dr. Rotta could not point to any accepted methodology or science to back up his opinions other than to say that it was his opinion"; therefore, she objected to "Dr. Rotta's opinions that the death of [A.B.] was a homicide, that it was due to forced sodium, that it included blunt force head trauma, and that delay in treatment had caused [A.B.'s] death." Overton challenges the methodology utilized by Dr. Rotta in forming his opinions. Thus, we must determine whether Dr. Rotta's testimony has its basis in sound scientific methodology.[185]

At the pre-trial hearing, Dr. Rotta testified that he is employed by the University of Texas Medical Branch, works at Driscoll, and is "a specialist in pediatric critical care medicine, dealing with all aspects of acutely ill and severely ill or injured children." Dr. Rotta is board certified in pediatrics and pediatric critical care and has treated approximately 1,000 patients per year in critical care. Dr. Rotta's experience and training include, among other things: (1) knowledge of the condition known as "pica"; (2) treatment of blunt force trauma to the head; (3) treatment of children who have experienced an out-of-hospital cardiac arrest; (4) sodium levels and how they increase over time; (5) the calculation of the amount of sodium chloride ingested by a child; and (6) child abuse.

Dr. Rotta was the treating physician who provided critical care to A.B. when he was brought to Driscoll. Dr. Rotta testified that he formed his opinions regarding A.B. based on his training and experience. Dr. Rotta stated that he consulted with the medical

---

[185] *Vela*, 209 S.W.3d at 133 ("'[R]eliability depends upon whether the evidence has its basis in sound scientific methodology. This demands a certain technical showing.' And that showing gives a trial judge the opportunity to 'weed out testimony pertaining to so-called 'junk science.'") (citing *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)).

examiner about the autopsy's findings. He also relied on his examination and treatment of A.B. and the medical history he acquired from Overton.

Dr. Rotta stated that he is qualified to analyze the lab's sodium results and that he has been analyzing sodium results in critically ill children since 1995. According to Dr. Rotta, it is standard procedure to test a child who is acutely ill for sodium, and that he has treated children suffering from sodium poisoning. Dr. Rotta testified that he tests the sodium levels in critically ill children because "[the sodium test] is one of the tests that is done to help establish whether or not that child has an imbalance of salt or water in the body as a potential cause for whatever dysfunction you're looking for." Dr. Rotta stated that he is qualified to determine toxic levels of sodium based on his "studies during medical school, through [his] speciality training in pediatrics, through [his] speciality training in critical care medicine, and [his] years in practice." Dr. Rotta analyzed A.B.'s sodium results and determined, based on the history he obtained from Overton, that A.B. suffered from sodium intoxication.

Dr. Rotta established through questioning Overton that A.B. was in "a perfect state of health until that afternoon." Overton provided Dr. Rotta with a history of the symptoms that A.B. exhibited when he first became ill and during the hour and a half before Overton took A.B. to UCC. According to Dr. Rotta, he determined that the history he acquired from Overton was consistent with the child suffering from acute sodium toxicity. Dr. Rotta based his opinion on Overton's statement that "she gave him a solution that later [Dr. Rotta] found out contained large amounts of sodium"; the fact that A.B. had "significantly elevated sodium in the body"; and his examination of A.B. and further testing ruling out other potential causes for the toxic levels of sodium. Dr. Rotta was able to rule out other

91

potential causes of A.B.'s high sodium levels using standard medical tests.

Dr. Rotta has treated children who have suffered an out-of-hospital cardiac arrest on many occasions. After reviewing the medical history that Overton provided, including, the sequence of events and the symptoms that A.B. suffered, Dr. Rotta had "no doubt" that A.B. could have been treated by the hospital if he had been taken to the hospital sooner. Dr. Rotta believed that A.B. suffered an out-of-hospital cardiac arrest and that the odds of a child surviving that event are lower than ten percent and the odds of "intact survival are virtually zero." According to Dr. Rotta, a child can be saved if the child does not suffer an out-of-hospital cardiac arrest.

As part of his training and experience, Dr. Rotta studied the levels of sodium and how they increase in the body. The multiple tests revealed that A.B.'s highest sodium level was "an immeasurably high level of sodium. It was greater than 250. . . ." A.B.'s sodium level was tested "dozens of times through different techniques to be sure this was not a technique-dependent error. [There were] also the blood results from a different laboratory. So this was not laboratory specific." According to Dr. Rotta, the tests performed were "standard labs" that are used every day when treating critically ill children. Through training and experience, Dr. Rotta learned how to calculate the amount of sodium chloride that A.B. must have ingested to reach the level he had in his body. According to Dr. Rotta, he has applied the calculation "multiple times in cases of sodium intoxication."

Based on his experience and training regarding child abuse and sodium poisoning, Dr. Rotta determined that A.B.'s ingestion of sodium was not accidental. According to Dr. Rotta, "[a]ll pediatric critical care physicians have training in child abuse. . . . Because it's a highly prevalent condition that pediatric critical care specialists have to treat." Child

92

abuse "is something that in a referral tertiary children's hospital, [a doctor] will see at least once a week." Dr. Rotta testified that Overton informed him that she gave A.B. "some chili as a stew" and "then in a second serving after some behavioral issues it was a mixture of the spice and water." Dr. Rotta stated that Overton explained that she gave A.B. the "spicy water solution" because he was misbehaving. Based on his education and experience, Dr. Rotta concluded that that act was abusive. Dr. Rotta also observed numerous injuries that, based on his experience and training in child abuse, he concluded were non-accidental.

Dr. Rotta based his opinions on his experience and training, his treatment of A.B., the tests used to evaluate A.B.'s illness, his consideration and rejection of other causes of high levels of sodium in a child, and the medical history he acquired from Overton. The trial court concluded that Dr. Rotta could testify to matters that he dealt with on a daily basis, what he observed, and what was within his knowledge.[186] Because the trial court admitted Dr. Rotta's testimony on the basis that his opinion was founded on his expertise in the field and on the widely accepted practice of differential diagnosis, we conclude that the trial court was within its discretion to find that *Daubert's* specific factors were not reasonable measures of reliability when applied to Dr. Rotta's opinion testimony.[187] Therefore, we will consider whether Dr. Rotta's methodology was reliable under the factors enumerated in *Nenno*.[188] We therefore consider: (1) whether Dr. Rotta's field of expertise

---

[186] The Texas Court of Criminal Appeals stated in *Vela*, "Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case. 209 S.W.3d at 134 (internal quotations omitted) (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)).

[187] *See Kumho Tire Co., Ltd.*, 526 U.S. at 153; *Henderson v. State*, 77 S.W.3d 321, 325 (Tex. App.–Fort Worth 2002, no pet.) (concluding that clinical medicine is not within the hard sciences contemplated by *Daubert* and therefore applying the *Nenno* factors instead).

[188] 970 S.W.2d at 560.

is a legitimate one; (2) whether the subject matter of Dr. Rotta's testimony is within the scope of that field; and (3) whether Dr. Rotta's testimony properly relies upon and/or utilizes the principles involved in the field.[189]

At the pre-trial hearing, Dr. Rotta established that he is board certified in pediatrics and pediatric critical care. The trial court allowed Dr. Rotta to testify regarding the subjects of child abuse, acute sodium toxic poisoning, the natural causes of high levels of sodium, pica, the survivability of a child who suffers an out-of-hospital cardiac arrest, and his opinion that A.B.'s head injury was a life-threatening condition. Dr. Rotta's testimony involved clinical medicine, and was based on the principles of differential diagnosis.

> [Differential Diagnosis] is a clinical process whereby a doctor determines which of several potential diseases or injuries is causing the patient's symptoms by ruling out possible causes—by comparing the patient's symptoms to symptoms associated with known diseases, conducting physical examinations, collecting data on the patient's history and illness, and analyzing that data—until a final diagnosis for proper treatment is reached.[190]

Differential diagnosis has widespread acceptance in the medical community and is "the basic method of internal medicine."[191] The State established that the subject matter of Dr. Rotta's testimony was within the field of pediatric critical care. Dr. Rotta was shown to have training in child abuse, sodium levels, sodium intoxication, other causes of elevated sodium levels, head injuries, "pica", and out-of-hospital cardiac arrest. Dr. Rotta testified that he used standard practice and procedures, including the widely accepted method of

---

[189] *Id.* at 561.

[190] *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604 (Tex. App.–Houston [1st Dist.] 2002, pet. denied).

[191] *Id.*

differential diagnosis, to determine the cause of A.B.'s illness. Therefore, we conclude that the trial court did not abuse its discretion in ruling that Dr. Rotta's testimony was reliable.[192] We overrule Overton's tenth issue.

## XI. CONCLUSION

Having overruled all of Overton's issues on appeal, we affirm the trial court's judgment.

LINDA REYNA YAÑEZ,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 29th day of October, 2009.

---

[192] In two sentences, Overton makes the bare assertion that Drs. Fernandez's and Rotta's testimony was "irrelevant" and "did not aid the trier of fact." To the extent that Overton attempts to raise a challenge to the doctors' testimony on a separate basis, we conclude that Overton has waived the issue because she has not provided a clear and concise argument supporting her assertion. *See* TEX. R. APP. P. 38.1(i).

95